**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIA VECCHIO, individually and on behalf of all others similarly situated, <br><br>          Plaintiff, <br><br>    -against- <br><br> QUEST DIAGNOSTICS INC., EXAMONE WORLD WIDE, INC., and EXAMONE LLC, <br><br>          Defendants. | **Civil Action No. 1:16-cv-05165-ER-KNF** |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CONDITIONAL CERTIFICATION OF THE FAIR LABOR STANDARDS ACT
<u>COLLECTIVE AND ISSUANCE OF COURT-APPROVED NOTICE</u>**

Arthur J. Rooney (admitted *pro hac vice*)
Laura E. Zabele (LZ-3238)
Baker & McKenzie LLP
300 E Randolph Street, Suite 5000
Chicago, IL  60601
+ 1 312 861 8000
+ 1 312 861 2899 (facsimile)

Robert P. Lewis (RL-6321)
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY  10018
+1 212 626 4100
+1 212 310 1600 (facsimile)

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

   I. ExamOne's Business Operations .....................................................................................2

   II. Examiners Have Different Job Duties And Work Schedules.........................................3

      A.     Some Examiners Perform Mobile Medical Exams ..................................3

           1.     Time Spent Per Exam And Traveling Varies ...............................4

           2.     Examiners Also Complete Pre- and Post-Exam Work For Mobile Exams ................................................................................4

      B.     Some Examiners Perform Medical Exams At The Office, At Client Health Fairs, Or Perform Specialty Exams...............................................6

      C.     Examiners' Work Schedules Vary .........................................................6

   III. Examiners Are Paid Differently Depending On The Work They Are Doing And Where They Are Doing It......................................................................................7

      A.     Some Examiners Receive Fee-For-Service Payment For Mobile Exams ......................................................................................................7

      B.     Some Examiners Receive Bonuses Or Mileage For Mobile Exams ..........8

      C.     Some Examiners Receive Hourly Pay For Pre- and Post-Mobile Exam Work ............................................................................................9

      D.     Some Examiners Receive An Hourly Rate For All Time In Addition To Medical Exam Fees .........................................................9

      E.     Some Examiners Receive Hourly Pay For Training, Branch Office Work, And Health Fairs.............................................................9

      F.     Some Examiners Are Paid Overtime......................................................10

      G.     ExamOne's Written Policies, Training, And On-Boarding Documents Clearly Explain The Pay Structure For Examiners...............10

   IV. Examiners Record Their Own Time And Are Instructed To Record All Time Worked.........................................................................................................................11

      A.     ExamOne Maintains A Lawful Written Policy On Timekeeping And Trains Examiners On That Policy...................................................11

      B.     Examiners' Timekeeping Practices For Mobile Exam Work Vary .........12

      C.     Examiners' Timekeeping Practices For Office And Health Fair Work Vary ...........................................................................................13

      D.     ExamOne Makes Missed Or Incorrect Time Punches Easy To Correct ..................................................................................................14

i

# TABLE OF CONTENTS

(continued)

**Page**

    V. ExamOne Also Engages Contractors To Perform Mobile Exams ............................14

ARGUMENT ..................................................................................................................15

    I. Conditional Certification Is Not Automatic ..............................................................15

    II. Plaintiff Cannot Establish That Examiners And Contractors In The Proposed
        Nationwide Collective Are Similarly Situated ........................................................17

        A.    The Court Should Not Consider Plaintiff's Vague, Identical
                Declarations .............................................................................18

        B.    Plaintiff Has Not Identified A Single Decision, Policy, or Plan ..............19

        C.    Examiners' Testimony Shows Significant Difference Among
                Potential Collective Members ....................................................22

    III. The Form And Method Of Plaintiff's Proposed Notice Is Inadequate And
        Improper. ............................................................................................................24

CONCLUSION ................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Basco v. Wal-Mart Stores, Inc.*,
  2004 U.S. Dist. LEXIS (E.D. La. July 2, 2004)....................................................17

*Bouder v. Prudential Fin., Inc.*,
  2007 U.S. Dist. LEXIS 83338 (D.N.J. Nov. 8, 2007)..........................................17

*Brown v. Barnes & Noble, Inc.*,
  252 F. Supp. 3d 255, 266 (S.D.N.Y. 2017) ........................................................16

*Eng-Hatcher v. Sprint Nextel Corp.*,
  2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009)...................................24

*Feng v. Hampshire Times*,
  2015 U.S. Dist. LEXIS 29899 (S.D.N.Y. Mar. 11, 2015) ....................................19

*Guan Ming Lin v. Benihana Nat'l Corp.*,
  755 F. Supp. 2d 504 (S.D.N.Y. 2010) .................................................................15

*Guillen v. Marshalls of MA, Inc.*,
  750 F. Supp. 2d 469 (S.D.N.Y. 2010) .................................................................15

*Guzelgurgenli v. Prime Time Specials Inc.*,
  883 F. Supp. 2d 340 (E.D.N.Y. 2012)..................................................................25

*Hamadou v. Hess Corp.*,
  915 F. Supp. 2d 651 (S.D.N.Y. 2013) .................................................................18

*Hernandez v. City of N.Y.*,
  2017 U.S. Dist. LEXIS 102285 (S.D.N.Y. June 29, 2017) ..................................15

*Levinson v. Primedia Inc.*,
  2003 U.S. Dist. LEXIS 20010 (S.D.N.Y. Nov. 6, 2003).......................................21

*Mata v. Foodbridge LLC*,
  2015 U.S. Dist. LEXIS 70550 (S.D.N.Y. June 1, 2015) ......................................15

*Mendoza v. Casa De Cambio Delgado, Inc.*,
  2008 U.S. Dist. LEXIS 27519 (S.D.N.Y. Apr. 7, 2008) .................................19, 20

*Michael v. Bloomberg L.P.*,
  2015 U.S. Dist. LEXIS 51030 (S.D.N.Y. April 17, 2015) ....................................25

*Prizmic v. Armour, Inc.*,
    2006 U.S. Dist. LEXIS 42627 (E.D.N.Y. June 12, 2006)....................................................17

*Reyes v. Nidaja, LLC*,
    2015 U.S. Dist. LEXIS 101728 (S.D.N.Y. Aug. 3, 2015)............................................... 16, 21

*Romero v. H.B. Auto. Group, Inc.*,
    2012 U.S. Dist. LEXIS 61151 (S.D.N.Y. May 1, 2012) .......................................................16

*Seever v. Carrols Corp.*,
    528 F. Supp. 2d 159 (W.D.N.Y. 2007)................................................................................20

*She Jian Guo v. Tommy's Sushi Inc.*,
    2014 U.S. Dist. LEXIS 147981 (S.D.N.Y. Oct. 16, 2014)............................................. 21, 22

*Tucker v. Labor Leasing, Inc.*,
    872 F. Supp. 941 (M.D. Fla. 1994) ....................................................................................25

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
    767 F. Supp. 2d 445 (S.D.N.Y. 2011) .................................................................................25

*Williams v. Accredited Home Lenders, Inc.*,
    2006 U.S. Dist. LEXIS (N.D. Ga. July 25, 2006)................................................................17

**Statutes**

Fair Labor Standards Act ("FLSA") ....................................................................................*passim*

Defendants, ExamOne World Wide, Inc., ExamOne LLC, and Quest Diagnostics Incorporated (collectively, "ExamOne"), submit this memorandum of law in opposition to Plaintiff's Motion for Conditional Certification of the Fair Labor Standards Act ("FLSA") Collective and Issuance of Court-Approved Notice. (Dkt. # 513-14.)

## INTRODUCTION

Plaintiff Maria Vecchio previously worked for ExamOne as a mobile medical examiner and typically performed medical exams on life insurance applicants. These exams could take place at the applicant's home or office, at a health fair, or at an ExamOne office. The gist of Plaintiff's claims is that ExamOne did not pay her and other examiners minimum wage and overtime because examiners were forced to work "off the clock." Plaintiff now seeks to conditionally certify a nationwide class of more than 8,000 current and former examiners who worked as both employees and independent contractors.

Although she filed her case over 17 months ago, Plaintiff does not cite to any handbook, instructions, policy, or practices that caused examiners to work off the clock. Instead, Plaintiff relies on the conclusory declarations of 55 individuals who all claim that they were "paid by the appointment," that they worked "off the clock" before and after appointments, and, as a result, that they were not paid "minimum wage and/or overtime." But these witnesses fail to explain why they allegedly were not paid minimum wage "and/or" overtime. They do not even say whether they recorded their hours worked, which is unusual for an off-the-clock case (were they ever "on the clock"?). If they recorded their time, they do not describe how they recorded it or why they did not record all of their work. Nor do these witnesses discuss how many hours per week they worked, how many hours they worked off the clock, or how much they were paid for appointments. Although many of Plaintiff's declarants were paid by the hour, none of them

disclose that fact. Given how many details are left out of Plaintiff's declarations, these omissions were not by mistake.

By contrast, ExamOne has submitted declarations that provide these critical details. As these declarations illustrate, some examiners are always paid by the hour and not by appointment; others are paid an exam fee plus their hourly wage. And whether and how examiners track their hours worked varies. Moreover, some examiners never have to do the pre- and post-exam work described by Plaintiff because they perform exams at offices or health fairs, and do not travel to applicants' homes. Others perform exams at offices, health fairs, and at applicants' homes, and how they are paid varies by individual and exam. When examiners do travel for exams, some of them are paid by the hour for their travel time and pre- and post-exam work; others are paid a set fee to cover this time. Some examiners do not even perform the exams themselves but use other employees or contractors to do so. These are just some of the differences that illustrate why it would be untenable for this case to proceed as a collective action.

Accordingly, the Court should deny Plaintiff's motion for conditional certification.

## FACTUAL BACKGROUND

### I.     ExamOne's Business Operations.

ExamOne is the largest provider of risk assessment services for life insurance companies in North America. It helps insurers meet their underwriting needs by providing convenient specimen collection for policy applicants via in-office or in-home phlebotomy and courier services. ExamOne also provides specimen collection and exam services at approximately 700 locations across the United States. ExamOne's team includes medical examiner employees who

perform medical exams and specimen collection on insurance policy applicants ("Examiners").[1]

Plaintiff Maria Vecchio is a former Examiner. ExamOne first engaged Vecchio as an independent contractor around November 2013, and she performed mobile medical exams as a contractor from January–July 2014. Vecchio then became an Examiner for ExamOne in July 2014, and worked as an Examiner until October 2016. She was based out of ExamOne's branch office in New York City.[2]

## II.  Examiners Have Different Job Duties And Work Schedules.

Generally, Examiners perform medical exams on life insurance applicants based on work orders from insurance companies. These exams can range from simply filling in paperwork and taking physical measurements to taking comprehensive paramedical histories with blood draws, urine specimen collections, and electrocardiograms. With very limited exceptions, all Examiners are part-time employees who do not work more than 29 hours per week.[3] When and where Examiners work, however, and how they are paid, varies based on the Examiner.

### A.  Some Examiners Perform Mobile Medical Exams.

Some Examiners perform "mobile" medical exams by traveling to the insurance applicant's home or business. Examiners have a designated area where they travel to perform mobile exams based on zip codes they provide to ExamOne.[4] Examiners can also choose whether to take appointments outside of their designated area.[5]

#### 1.  Time Spent Per Exam And Traveling Varies.

The time spent per mobile exam for each Examiner depends on a number of factors. A

---

[1] *See* Declaration of Rick Kingcade ("Kingcade Dec.") at ¶ 2.
[2] *Id.* at ¶ 3.
[3] *Id.* at ¶¶ 4-5.
[4] *Id.* at ¶ 6; *see also, e.g.*, Declaration of Tiffany Anderson ("Anderson Dec.") at ¶ 2; Declaration of Virgie Carter ("Carter Dec.") at ¶ 6; Declaration of Ashton Gerlach ("Gerlach Dec.") at ¶ 4.
[5] *See, e.g.*, Declaration of Tremaine Brantley ("Brantley Dec.") at ¶ 3; Gerlach Dec. at ¶ 4 ("It is always my decision whether to take . . . appointments outside of my area"); Carter Dec. at ¶ 6 ("It is always my choice whether to take these [far-away] exams or what kind of schedule I wanted to keep").

more simple exam (such as short paperwork and physical measurements) can take only 5-10 minutes; a more complicated exam (such as one that includes an electrocardiogram or involves an older patient with an extensive paramedical history) can take an hour.[6] In its Standards and Protocols Manual for Examiners, ExamOne provides a list of time estimates needed to complete various tests. For example, the time estimate for a blood draw is approximately 15 minutes, for a paramedical history (includes medical history and vital signs) is approximately 15-30 minutes, and for an electrocardiogram is approximately 15 minutes.[7] Even then, however, the average time spent per exam varies for each Examiner from 15 minutes to 1.5 hours.[8] Similarly, the travel time between each exam varies based on the Examiner and his or her location; for some whose designated area includes larger areas, it can take 45 minutes to drive to the next client appointment; for others, the average travel time is 15-30 minutes.[9]

### 2.   Examiners Also Complete Pre- and Post-Exam Work For Mobile Exams.

In addition to the mobile exams themselves, Examiners spend time preparing for and closing out exam orders. Examiners are instructed to call clients the night before the exam to confirm their appointments and to print paperwork for the exams, generally from their home office.[10] Some Examiners start to fill in paperwork the night beforehand as well; others wait until

---

[6] *See* Kingcade Dec. at ¶ 7; *see also, e.g.*, Declaration of Becky Carlson ("Carlson Dec.") at ¶ 3; Declaration of Davene Willard ("Willard Dec.") at ¶ 9; Carter Dec. at ¶ 8 ("The exams themselves generally take 30-45 minutes, depending on the type of exam, whether I need to get a paramedical history, and if the patient is older").

[7] Kingcade Dec. at ¶ 8, Ex. A, pp. 7-8.

[8] *See, e.g.*, Willard Dec. at ¶ 9 ("[Exams] will take me 30 minutes to an hour each, depending on the type of the exam, the amount of paperwork, and the age of the patient"); Declaration of Denise Baca ("Baca Dec.") at ¶ 7 ("Most medical exams take me about 15-45 minutes to complete. But an exam can take up to an hour if I have to do an EKG test"); Declaration of Macheall Amador ("Amador Dec.") at ¶ 7 ("The mobile exams usually take me 15-40 minutes to complete"); Anderson Dec. at ¶ 5 ("The exams themselves take anywhere from 30 minutes to 1.5 hours, depending on the type of exam").

[9] *See, e.g.*, Declaration of Melinda Miller ("Miller Dec.") ¶ 3; Declaration of Bianca Alexander ("Alexander Dec.") at ¶ 17 ("The travel time for each client visit takes me, on average, approximately 15 minutes"); Anderson Dec. at ¶ 2 ("[I]t usually takes me 30-35 minutes to travel from my house to client appointments"); Gerlach Dec. at ¶ 4 ("Traveling to each client visit took me anywhere from 5 minutes to 45 minutes, depending on the location").

[10] Kingcade Dec. at ¶ 8, Ex. A, pp. 2-3.

4

the exam to complete the paperwork.[11] The amount of time spent on pre-exam work varies from Examiner to Examiner, and depends on the amount of paperwork and the number of exams the Examiner has the next day.[12] For some Examiners, pre-exam work takes 1-2 hours to complete; for others, it takes a matter of minutes.[13] Some Examiners will also perform additional tasks such as planning their route for the next day and preparing lab kits for each appointment.[14]

After mobile exams are completed, Examiners need to scan and upload paperwork, spin blood samples, package specimens for shipment in lab kits, and ship the specimens to ExamOne's lab for analysis.[15] Some Examiners will spin blood in the centrifuge in their car while they are traveling to their next appointments; other will wait until they return home to spin the blood.[16] For shipment, ExamOne provides Examiners with pre-paid FedEx labels.[17] Some Examiners will drive the packages to FedEx themselves; others will arrange for FedEx to pick up the packages from their homes; others drop off the packages at their local office.[18] The time it takes Examiners to complete this post-exam work varies depending on the number of exams and the amount of paperwork, but can take anywhere from 15 minutes to several hours.[19]

---

[11] *See, e.g.*, Willard Dec. at ¶ 8 (fills in as much of the paperwork as possible prior to the mobile exams); Declaration of Kerry Caples ("Caples Dec.") at ¶ 7 (does not complete paperwork before the mobile exam).

[12] *See, e.g.*, Willard Dec. at ¶ 8; Alexander Dec. at ¶ 4; Miller Dec. at ¶ 4 ("Each day, the time for prep work varies depending on the amount of paperwork and the number of exams").

[13] *See, e.g.*, Declaration of Teri Skelton ("Skelton Dec.") at ¶ 7 (1-2 hours for pre-exam work); Declaration of Marina Gonzalez ("Gonzalez Dec.") at ¶ 7 (10-15 minutes for pre-exam work); Declaration of Joanna Wurth ("Wurth Dec.") at ¶ 7 (5 minutes per exam for pre-exam work); Brantley Dec. at ¶ 6 (30 minutes to 1 hour for pre-exam work); Caples Dec. at ¶ 7 ("pre-exam work only took a couple of minutes to complete").

[14] *See* Declaration of Carmen Soto ("Soto Dec.") at ¶ 6.

[15] *See, e.g.*, Skelton Dec. at ¶ 8; Caples Dec. at ¶ 7; Alexander Dec. at ¶ 5; Willard Dec. at ¶ 10.

[16] *See* Gonzalez Dec. at ¶ 9 ("I spin blood in my centrifuge that I carry in my car (i.e., I spin the blood while I'm driving"); *see also, e.g.*, Caples Dec. at ¶ 7; Miller Dec. at ¶ 6; Declaration of Ashley Riley ("Riley Dec.") at ¶ 10.

[17] *See, e.g.*, Brantley Dec. at ¶ 7; Carlson Dec. at ¶ 5; Anderson Dec. at ¶ 6; Soto Dec. at ¶ 7.

[18] *See, e.g.*, Carlson Dec. at ¶ 7; Gerlach Dec. at ¶ 5 ("Since I lived near a FedEx location and it was more convenient than arranging for a FedEx pickup, I would drive the client samples to FedEx and drop them off for shipment"); Anderson Dec. at ¶ 6 ("I also arrange for FedEx to pick up samples for shipment at my house (ExamOne gives me a pre-paid FedEx label)").

[19] *See, e.g.*, Caples Dec. at ¶ 7 (15 minutes-1 hour for post-exam work); Soto Dec. at ¶ 7 ("The post-exam work generally takes me 30 minutes to 3 hours, depending on the amount of paperwork and the number of exams I completed that day"); Brantley Dec. at ¶ 7 (40 minutes-1 hour to complete this post-exam work); Anderson Dec. at ¶ 6 (5 minutes-3 hours for post-exam work, depending on the number of exams and the amount of paperwork).

**B.     Some Examiners Perform Medical Exams At The Office, At Client Health Fairs, Or Perform Specialty Exams.**

Some Examiners perform medical exams at ExamOne's offices or at client health fairs.[20] Unlike mobile exams, Examiners do not need to do any pre- and post-exam work or travel to appointments when they work at health fairs or in the office.[21] Some Examiners solely perform exams at ExamOne's offices; others only work at health fairs.[22] Some Examiners do a combination of the two, and some do both in conjunction with mobile exams.[23] Finally, some Examiners perform specialty drug, alcohol, and emergency drug and alcohol testing (e.g., performing drug and alcohol tests on airport employees).[24]

**C.     Examiners' Work Schedules Vary.**

Examiners choose when and where they want to work.[25] Generally, for mobile exams, the Examiners' branch office will try schedule the Examiners' appointments each day so that the appointments are as close together (in terms of time and geography) as possible.[26] But some Examiners will schedule exams in blocks to accommodate other work, such as a full-time job at a nearby hospital or mobile medical exam work with ExamOne's competitors.[27]

---

[20] *See, e.g.*, Skelton Dec. at ¶ 3; Declaration of Isidra Martin ("Martin Dec.") at ¶ 2; Caples Dec. at ¶ 2; Willard Dec. at ¶ 2; Alexander Dec. at ¶ 2.

[21] *See* Declaration of Jeffia McCallop ("McCallop Dec.") at ¶ 5 ("I don't need to do any work from home for the health fairs or office exams").

[22] *See, e.g.*, McCallop Dec. at ¶ 2 ("I mostly perform medical exams at health fairs. I have never done mobile medical exams"); Martin Dec. at ¶ 2; Caples Dec. at ¶ 2.

[23] *See, e.g.*, Willard Dec. at ¶ 2; Alexander Dec. at ¶ 2; Soto Dec. at ¶ 2; Riley Dec. at ¶ 2; Amador Dec. at ¶ 3; Gerlach Dec. at ¶ 8; Alexander Dec. at ¶ 2.

[24] *See* Declaration of Steven Komala ("Komala Dec.") at ¶ 9.

[25] *See, e.g.*, Gerlach Dec. at ¶ 9 ("My schedule is flexible and I tell [my manager] if I want to change it or only work certain days"); Gonzalez Dec. at ¶ 13 ("[I]t's my decision whether to take a field exam or not"); Alexander Dec. at ¶ 2 ("I also voluntarily travel to the St. Louis area to perform medical exams at client homes"); Caples Dec. at ¶ 4 ("[M]y hours fluctuate and I can choose when I work and what type of work I do"); Wurth Dec. at ¶ 4 ("I can choose how often I work and what type of work I do (e.g., health fairs, mobile exams, office work)").

[26] Kingcade Dec. at ¶ 9; Willard Dec. at ¶ 7; Caples Dec. at ¶ 9.

[27] *See, e.g.*, Gerlach Dec. at 6; Baca Dec. at ¶ 4 (works 40 hours or more per week as a clinical research tech for a different company); Wurth Dec. at ¶ 6 (worked for some of ExamOne's competitors during the last two years); Anderson Dec. at ¶ 10 (performs mobile medical exams for several other companies as an independent contractor).

Examiners are not required to work a minimum number of hours.[28] Some can work as much or as little as they want; others are expected to work 29 hours or less.[29] The number of exams that each Examiner has per day will vary based on their designated area (for mobile exams) and the number of appointments or hours they want to work on any given day of the week.[30] How many hours Examiners work also varies depending on the amount of available work — some Examiners would like to work more but there simply is not enough work.[31]

## III. Examiners Are Paid Differently Depending On The Work They Are Doing And Where They Are Doing It.

### A. Some Examiners Receive Fee-For-Service Payment For Mobile Exams.

For mobile exams, ExamOne pays most Examiners per exam based on set fees for the services they perform. These fees range based on the length or complexity of the services provided during the exam. Moreover, each Examiner is paid based on a fee schedule that is tied to his or her service area and skill set; in fact, ExamOne has 22 levels (or "tiers") of fee schedules that apply to Examiners.[32]

For the Tier 1 fee schedule, for example, an Examiner is paid $12.34 for physical measurements (Code 146) and $26.64 for physical measurements, blood draw, urinalysis, and electrocardiogram (Code 115). In contrast, under the Tier 7 fee schedule, an Examiner is paid

---

[28] Kingcade Dec. at ¶ 5; *see, e.g.,* Carlson Dec. at ¶ 10; Gerlach Dec. at ¶ 9; Soto Dec. at ¶ 12.

[29] *See, e.g.,* Alexander Dec. at ¶ 9 ("ExamOne provides me with flexibility to work as few as 1 hour per week to as many as 30 hours per week"); Gonzalez Dec. at ¶ 14 ("I currently work approximately 20 hours per week as a part-time employee"); Amador Dec. at ¶ 2 ("I almost always work less than 20 hours per week"); Gerlach Dec. at ¶ 9 ("I work approximately 30 hours per week. My [manager] . . . monitors my timekeeping to make sure that I am generally not working more than 30 hours per week (in which case she tells me not to pick up new work)").

[30] *See, e.g.,* Miller Dec. at ¶ 9 (does mobile exams Monday through Saturday but completes an average of 12 exams per week); Willard Dec. at ¶ 9 (works Monday-Thursday from 6:30–11:00/12:00 doing mobile exams and Fridays at the Overland Park office); Wurth Dec. at ¶ 4 ("I choose how often I work and what type of work I do (e.g., health fairs, mobile exams, office work). I can work as much as ExamOne needs me and there are no restrictions on my work hours. Because of this flexibility, my hours vary").

[31] *See, e.g.,* Komala Dec. at ¶ 2 ("I'd like to work more hours for ExamOne but there's simply not enough work available to do so"); Riley Dec. at ¶ 3 ("I don't recall ever working more than 25 hours in one week. There's simply not enough work available for me to work more than that").

[32] Kingcade Dec. at ¶¶ 10-11.

$15.63 for a physical measurements (Code 146) and $33.73 for physical measurements, blood draw, urinalysis, and electrocardiogram (Code 115). Examiners are also paid additional fees for completing certain types of paperwork. Under the Tier 8 fee schedule, an Examiner is paid $2.99 for completing an HIV Consent Form (Code 299) and $2.43 for a questionnaire (Code 208).[33]

### B.   Some Examiners Receive Bonuses Or Mileage For Mobile Exams.

In addition to the mobile exam service fee, some Examiners are paid a discretionary bonus if they agree to take an appointment that is far away from their designated area, if they perform a more complex exam, or if the exam includes extra paperwork.[34] Other Examiners submit their mileage for reimbursement depending on how far they have to travel.[35] Some Examiners receive a "no show" bonus if the applicant does not show up for the appointment.[36] Others receive a discretionary bonus if ExamOne receives positive feedback about the exam from the client.[37] Finally, some examiners have separate fee arrangements for specialty medical exams that they complete. For example, one Examiner is paid (i) for drug testing, a minimum of $90 plus mileage for up to six patients, plus an $15 extra for each additional patient; (ii) for alcohol testing, $35 per patient plus mileage; and (iii) for emergency testing (e.g., performing drug and alcohol tests on airport employees), $195 per emergency call plus mileage.[38]

### C.   Some Examiners Receive Hourly Pay For Pre- and Post-Mobile Exam Work.

In addition to receiving the mobile exam fee, some Examiners are paid their hourly rate

---

[33] *Id.* at Ex. B.

[34] *See, e.g.*, Wurth Dec at ¶ 2("I also sometimes receive bonuses if I do an exam that is far away from my house or if the exam includes additional paperwork to complete"); Gerlach Dec at ¶ 4; Soto Dec. at ¶ 9 (paid discretionary bonus of $25-35 depending on distance); Willard Dec at ¶ 7; Alexander Dec. at 7; Wurth Dec. at ¶ 2 (receives bonus if an exam is far away or includes additional paperwork); Riley Dec. at ¶ 8; Komala Dec. at ¶ 4 ("If I have to travel farther or pay for parking, I'll get a bonus to cover the mileage or cost of parking").

[35] *See, e.g.*, Skelton Dec at ¶ 6 ("I sometimes get paid for my mileage when I agree to drive to an appointment that is far from my home"); Brantley Dec at ¶ 3 (reimbursed for mileage if exam is outside her area).

[36] *See* Gerlach Dec at ¶ 4; Willard Dec. at ¶ 7; Brantley Dec. at ¶ 4.

[37] *See* Alexander Dec at ¶ 7.

[38] *See* Komala Dec at ¶ 9.

for all of their pre- and post-mobile exam work.[39] Yet others do not receive hourly pay for pre- and post-mobile exam work. Instead, they are only paid a flat fee intended to cover pre- and post-exam work, travel, and the exam itself.[40]

### D. Some Examiners Receive An Hourly Rate For All Time In Addition To Medical Exam Fees.

Some Examiners are paid an hourly rate for all working time, in additional to the fees they receive for mobile medical exams.[41] As of October 2017, Examiners in California are paid by the hour for any work they perform.[42]

### E. Some Examiners Receive Hourly Pay For Training, Branch Office Work, And Health Fairs.

Examiners are also paid by the hour for other types of work. When this occurs, or how much they are paid, differs from office to office and Examiner to Examiner. Examiners are typically paid $25 per hour when they work at a health fair, but some are paid $27 per hour if they are the lead Examiner at the health fair.[43] Other Examiners receive mileage reimbursement or travel expenses if the health fair is far away.[44] For medical exams performed at ExamOne offices, Examiners are paid their base hourly rate, but their individual rates differ.[45] Examiners are also paid their hourly base rate for any training that they complete.[46]

### F. Some Examiners Are Paid Overtime.

Some Examiners work full-time in ExamOne branch offices.[47] When these Examiners

---

[39] *See, e.g.*, Willard Dec. at ¶¶ 8, 10 ($17.50/hour for pre- and post-exam work); Skelton Dec. at ¶¶ 7-8 ($17.50/hour for pre- and post-exam work); Riley Dec. at ¶ 9 ($15.83/hour for pre- and post-exam work); Soto Dec. at ¶¶ 6-7 ($17.69/hour for pre- and post-exam work); Baca Dec. at ¶ 7 ($19.29/hour for pre- and post-exam work).

[40] *See generally* Caples Dec.; Brantley Dec.; Anderson Dec.; Carter Dec. at ¶¶ 7, 9.

[41] *See* Skelton Dec. at ¶ 6.

[42] Kingcade Dec. at ¶ 12.

[43] *See* Martin Dec. at ¶ 5; Soto Dec at ¶ 3; Carter Dec. at ¶ 4; *but see* Miller Dec. at ¶ 7 ($17.30/hour for health fairs).

[44] *See* Martin Dec. at ¶ 6 (noting ExamOne will reimburse her for mileage if the health fair is more than 30-40 miles away from her home, and will also pay for her to stay in a hotel if the health fair is more than two hours away).

[45] *See, e.g.*, Anderson Dec. at ¶ 8 ($19.29/hour); Riley Dec. at ¶ 6 ($15.83/hour); Miller Dec. at ¶ 7 ($17.30/hour); Willard Dec. at ¶ 3 ($17.69/hour); Wurth Dec. at ¶ 2 ($18.76/hour); Baca Dec. at ¶ 2 ($19.29/hour); Gonzalez Dec. at ¶ 12 ($17.69/hour); Carter Dec. at ¶ 11 ($17.69/hour).

[46] *See* Alexander Dec. at ¶ 8 ($17.69/hour); Carlson Dec. at ¶ 9 ($18.23/hour); Martin Dec. at ¶ 7 ($17.00/hour).

work 40 hours or more, they receive overtime compensation at time and one-half their hourly base rate of pay.[48] Likewise, some Examiners work 40 hours or more doing medical exams at client health fairs. These Examiners also receive overtime compensation at time and one-half their hourly rate for health fairs.[49] Plaintiff Vecchio and other opt-ins received overtime pay.[50]

### G. ExamOne's Written Policies, Training, And On-Boarding Documents Clearly Explain The Pay Structure For Examiners.

ExamOne is clear — by way of written policies, training, and other documents provided to Examiners — in how Examiners are compensated. For example, Opt-in Plaintiff Zeanza Penistan, who has filed a declaration to support Plaintiff's motion, received an employment offer letter that clearly stated on the first page:

> Your salary is based on fee schedule 2, payable on a biweekly basis. When you are not performing mobile exams, but are working in the office your base rate of pay will be $14.59 per hour, payable on a biweekly basis. Your overtime rate of pay, if applicable, will be $21.89 per hour, payable on a biweekly basis.[51]

Further, the manager training about "Employee Pay" instructs managers to inform Examiners that pay is "fee for service" but that "hourly wage [is] used for training and work in the office."[52] Similarly, ExamOne's "Employee Handbook Compensation Policies," which Plaintiff Vecchio produced in discovery, provides:

> Quest Diagnostics will pay overtime, as required by law, when non-exempt employees work more than 40 hours in a work week. Non-exempt employees are paid one and one-half times the regular hourly rate for all hours worked in excess of 40 hours in a work week, expect where applicable state wage and hour laws require otherwise.[53]

---

[47] *See* Gerlach Dec. at ¶ 10.
[48] *Id.*; Kingcade Dec. at ¶ 13.
[49] *Id* at ¶ 14; *see* Soto Dec at ¶ 13.
[50] Kingcade Dec. at ¶ 15, Ex. C.
[51] *Id.* at ¶ 16, Ex. D.
[52] *Id.* at ¶ 17, Ex. E.
[53] *Id.* at ¶ 18, Ex. F.

In short, ExamOne has clear written policies, as well as training and on-boarding documents, that explain Examiner pay.

## IV.    Examiners Record Their Own Time And Are Instructed To Record All Time Worked.

### A.    ExamOne Maintains A Lawful Written Policy On Timekeeping And Trains Examiners On That Policy.

Examiners record their time using ExamOne's electronic attendance and timekeeping system, Workforce Central Teletime ("Teletime").[54] To clock in and out with Teletime, Examiners call a 1-800 number, enter their employee IDs, enter their password, and then press the "#" key or hang up — a process that takes a few seconds to a minute to complete.[55] But some Examiners do not use Teletime and instead manually record their time on paper timesheets that they submit each week to their managers.[56]

ExamOne trains Examiners on how to use Teletime to clock in and out, and when to clock in and out.[57] The Teletime instructions provide as follows:

As a mobile examiner, you will use the Workforce Teletime phone system to record your working hours (in/outpunches).

- Record your time as soon as you begin travel to your first appointment because your home is your 'place of work'.
- If you will be returning home after your first appointment, punch out as soon as you arrive home. If travel to your second appointment of the day starts/ends at home, punch in as you are leaving home and punch out when you return home.
- If you are going immediately from your first appointment to your second appointment of the day, remain punched in until all sequential appointments are completed.
- If you have a gap between appointments, you are free to use this time as you wish, therefore you should punch out when you complete your

---

[54] Kingcade Dec. at ¶ 19, Ex. G; *see also, e.g.*, Amador Dec. at ¶ 4; Alexander Dec. at ¶ 10; Martin Dec. at ¶ 4.

[55] Kingcade Dec. at ¶ 19, Ex. G; *see also, e.g.*, Caples Dec. at ¶ 5; Brantley Dec. at ¶ 2; Carlson Dec. at ¶ 11; Gerlach Dec. at ¶ 2; Soto Dec. at ¶ 4.

[56] *See* Skelton Dec. at ¶ 4 ("Because I am not comfortable using ExamOne's timekeeping system, I record my hours worked on a paper timesheet").

[57] Kingcade Dec. at ¶ 19, Ex. G, p. 2.

> appointment and punch back in when you begin to travel to your next appointment.
> - If you are working in the branch as an hourly employee, use Tele[t]ime to clock in when you arrive and clock out when you leave.[58]

Moreover, ExamOne's Expectations and Protocols for On-Call Examiners instructs Examiners to record all of their time worked: "**Examiners are required to clock in/out any time you are working for ExamOne. Failure to clock in/out can result in disciplinary action. Repeat offenses may result in termination.**"[59]

### B.   Examiners' Timekeeping Practices For Mobile Exam Work Vary.

Even when using the same timekeeping system, there are still differences in the ways that Examiners clock in and out. For mobile exams, Examiners clock in when they start traveling to their first appointment and will stay clocked in if their appointments are back-to-back and they are traveling directly to the next appointment.[60] But if there is a large gap in between appointments (generally 1.5-2 hours or more), or if the Examiners are running a personal errand in-between appointments, they will clock out and then clock back in when they start traveling to their next appointment.[61] Examiners will typically clock out when they arrive back home after their exams are done for the day, but some clock out as soon as they leave their last exam.[62] For pre- and post-exam work, such as calling to confirm client appointments, printing and scanning/uploading paperwork, and spinning blood, some Examiners clock in and out (or stay clocked in after they finish their mobile exams for the day), but other Examiners will not clock in and out for pre- and post-mobile exam work.[63] So some Examiners record their pre- and post-

---

[58] *Id.*
[59] *Id.* ¶ 20, Ex. H, .p. 1.
[60] *See, e.g.*, Riley Dec. at ¶ 7; Miller Dec. at ¶ 5; Carter Dec. at ¶ 8; Willard Dec. at ¶ 7; Alexander Dec. at ¶ 11.
[61] *See, e.g.*, Caples Dec. at ¶ 5; Gonzalez Dec. at ¶ 8; Brantley Dec. at ¶ 5; Carlson Dec. at ¶ 7; Gerlach Dec. at ¶ 7.
[62] *See, e.g.*, Soto Dec. at ¶ 5; Caples Dec. at ¶ 5; Amador Dec. at ¶ 6; Baca Dec. at ¶ 5; Anderson Dec. at ¶ 4.
[63] *See, e.g.*, Komala Dec. at ¶¶ 6-7 (does not clock in for pre-exam work but stays clocked in after mobile exams to complete post-exam work); Baca Dec. at ¶ 5 ("I also clock in when I'm doing any pre-exam and post-exam work"); Carlson Dec. at ¶ 7 ("I am always clocked in when I'm travelling to and from exams, performing exams, and doing

12

exam work, yet others choose not to do so.

### C. Examiners' Timekeeping Practices For Office And Health Fair Work Vary.

Examiners also have different timekeeping practices when they perform medical exams at ExamOne branch offices. Some Examiners clock in when they leave their homes to drive to the office and clock out when they return home.[64] Other Examiners clock in when they arrive at the office and clock out when they leave the office for the day.[65] In further contrast, some Examiners will clock in and out for lunch.[66] The same differences are true when Examiners work at client health fairs. Some Examiners clock in when they leave their house to travel to the health fair and clock out when they leave the fair, but others only clock out at the set time when their shift at the health fair is due to end, even if the health fair ends early.[67] Other Examiners clock in when they get to the health fair and clock out when they leave the health fair, or clock out after they have dropped off specimens at the ExamOne branch office.[68]

### D. ExamOne Makes Missed Or Incorrect Time Punches Easy To Correct.

ExamOne's "Historical Edits Job Aid" guidelines provide clear instructions to Examiners on how to correct punches, which will "initiate payment for missing time either on the next payroll or through an off-cycle check with the appropriate approvals."[69] In furtherance of this policy, Examiners also contact their managers if they need to enter or correct a punch, and their

---

any pre- and post-exam work"); Brantley Dec. at ¶¶ 6-7 (does not clock in for pre-exam work, explaining "[i]f I've finished earlier than expected with client appointments, I'll stay clocked in when I return home from the exams and complete the post-exam work. Otherwise, I don't clock in"); Gonzalez Dec. at ¶ 10 ("I suppose I could clock in for pre- and post-exam work but it never crossed my mind"); Carter Dec. at ¶¶ 7, 9 ("I used to not clock in for this [pre-exam] work but now I do. . . . I clock in when I start spinning the blood and clock out when I'm done with paperwork. Sometimes if I don't have a lot to do and can finish everything quickly, I don't clock in").
[64] *See, e.g.*, Willard Dec. at ¶ 5; Miller Dec. at ¶ 7; Martin Dec. at ¶ 8.
[65] *See, e.g.*, Soto Dec. at ¶ 10; Gonzalez Dec. at ¶ 12; Gerlach Dec. at ¶ 8.
[66] *See* Wurth Dec. at ¶ 3.
[67] *See, e.g.*, Willard Dec. at ¶ 6; Miller Dec. at ¶ 7; Martin Dec. at ¶ 5; McCallop Dec. at ¶ 5.
[68] *See, e.g.*, Riley Dec. at ¶ 5; Gonzalez Dec. at ¶ 11; Wurth Dec. at ¶ 3; Caples Dec. at ¶ 5.
[69] Kingcade Dec. at ¶ 21, Ex. I, p. 1.

manager will manually enter it into the timekeeping system.[70]

## V.    ExamOne Also Engages Contractors To Perform Mobile Exams.

In addition to Examiners, ExamOne engages independent contractors to perform mobile medical exams ("Contractors"). How these Contractors are paid depends on the terms of the agreement they negotiate with ExamOne. One Contractor, for example, originally was paid 39% of the fee collected by ExamOne for each mobile exam she completed. After negotiating a new contract, she now receives between 49% and 60% of the fee collected by ExamOne.[71]

Unlike Examiners, Contractors do not record their time with ExamOne and they provide their own tools and equipment.[72] Some Contractors have their own company; others do not.[73] Additionally, some Contractors use their own employees or contractors to perform mobile exams for ExamOne. One Contractor, for example, employs three part-time employees through her company to perform mobile exams. Because she only pays these employees a portion of the fee she receives from ExamOne, this Contractor has the opportunity to make a profit from this arrangement.[74] While engaged with ExamOne, some Contractors also perform medical exam work for ExamOne competitors or other companies.[75]

## <u>ARGUMENT</u>

## I.    Conditional Certification Is Not Automatic.

Plaintiff's recitation of the standard of review gives the erroneous impression that there is a presumption in favor of conditional certification. While the burden on the plaintiff at the

---

[70] *See, e.g.*, Alexander Dec. at ¶ 12; Martin Dec. at ¶ 10; Gonzalez Dec. at ¶ 5; Carter Dec. at ¶ 5.
[71] *See* Declaration of Melody Brosnan ("Brosnan Dec.") at ¶ 7.
[72] *See* Gonzalez Dec. at ¶ 3; Carter Dec. at ¶ 4; Brosnan Dec. at ¶ 9 ("Although I used to record all of my hours worked for ExamOne while I was an employee, I stopped recording my hours worked when I entered into an independent contractor agreement with ExamOne").
[73] *See* Brosnan Dec. at ¶ 6; Gonzalez Dec. at ¶ 3.
[74] *See* Brosnan Dec. at ¶ 7; Skelton Dec. at ¶ 2.
[75] *See* Gonzalez Dec. at ¶ 3; Skelton Dec. at ¶ 2; Gonzalez Dec. at ¶ 3 ("When I was a contractor, I also did field medical exams as a contractor for two of ExamOne's competitors").

conditional certification stage is modest, it is not non-existent or automatic. *Hernandez v. City of N.Y.*, 2017 U.S. Dist. LEXIS 102285, at *14 (S.D.N.Y. June 29, 2017) ("[C]ertification is not automatic, and plaintiffs cannot secure it through conclusory allegations or unsupported assertions."); *Mata v. Foodbridge LLC*, 2015 U.S. Dist. LEXIS 70550, at *6 (S.D.N.Y. June 1, 2015) ("Plaintiff's burden of proof is low, but it is not non-existent. . . . Plaintiff must offer actual evidence of a factual nexus between his own experience and the experiences of those he claims as similarly situated, rather than mere conclusory allegations.") (internal quotation marks and citations omitted); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010) ("In presenting evidence on the appropriateness of granting collective action status, the plaintiff's burden may be very limited, and require only a modest factual showing, but the burden is not non-existent and the factual showing, even if modest, must still be based on some substance.") (internal quotation marks and citations omitted).

To succeed in her motion, Plaintiff must demonstrate that she and the putative class members are "similarly situated." *Guan Ming Lin v. Benihana Nat'l Corp.*, 755 F. Supp. 2d 504, 508 (S.D.N.Y. 2010). As this Court has explained, plaintiffs seeking conditional certification "must proffer substantial allegations of a factual nexus between the [plaintiffs] and potential opt-in plaintiffs with regard to their employer's alleged FLSA violation." *Romero v. H.B. Auto. Group, Inc.*, 2012 U.S. Dist. LEXIS 61151, at *23-24 (S.D.N.Y. May 1, 2012). This is especially true here where Plaintiff has had the benefit of discovery. *Id.* at *29 (denying conditional certification in part where plaintiff made no showing about a widespread failure to pay minimum wage despite access to defendants' pay records). The evidence offered by Plaintiff to support her motion must also not be conclusory. *Reyes v. Nidaja, LLC*, 2015 U.S. Dist. LEXIS 101728, at *3 (S.D.N.Y. Aug. 3, 2015).

To confirm, Plaintiff cannot simply rely on the fact that "over 400" individuals from across the county have opted into this lawsuit to show substantial similarity. *See Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 266 (S.D.N.Y. 2017) (explaining that "the mere existence of a certain number of plaintiffs, covering a sufficiently widespread geographic area, should not be expected by itself to give rise to a legally sufficient basis to find that plaintiffs are similarly situated across the nation absent actual evidence of a link between plaintiffs and those across the nation") (internal quotation marks omitted). The circumstances under which these individuals joined this action should also be considered. Between June 2016 and October 2017, only *nine* individuals opted in to this case (one of whom withdrew, and five of whom are examiners at ExamOne affiliates that Plaintiff now excludes from the putative collective). After Plaintiff's counsel called and sent multiple emails to thousands of Examiners and Contractors, over 400 individuals suddenly joined this case. But this was not a coincidence. They only opted in after Plaintiff improperly distributed nationwide notice of this litigation before she even sought this Court's permission to proceed as a collective action. One of Plaintiff's mass emails, for example, encouraged potential collective action members to join this case:

> While the purpose of this email is to gather information, not to solicit your involvement in the lawsuit, you are free to join the lawsuit if you like. We obviously welcome your participation. Joining the lawsuit only requires you to complete a simple half-page form. Significantly, the statute of limitations continues to run on your claims until you join this lawsuit or decide to file another action of your own. So, it is to your advantage to join this action or file a separate complaint as soon as possible if you are interested in pursuing your claims.[76]

"With this mass communication, Plaintiffs are flouting the statutory framework for opt-in collective actions, the Scheduling Order and this Court's authority to oversee notice to the putative class." *Bouder v. Prudential Fin., Inc.,* 2007 U.S. Dist. LEXIS 83338, at *4 (D.N.J.

---

[76] Kingcade Dec. at ¶ 22, Ex. J.

Nov. 8, 2007) (concluding that plaintiffs' counsel's letter was "an improper and unauthorized *de facto* notice").

Even when plaintiffs have met their burden, the decision to authorize notice of an FLSA action to putative class members remains soundly within the discretion of the court. *Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627, at *4 (E.D.N.Y. June 12, 2006). "To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for the same prior to certification would be an exercise in futility and wasted resources for all parties involved." *Basco v. Wal-Mart Stores, Inc.*, 2004 U.S. Dist. LEXIS, at *14 (E.D. La. July 2, 2004). And where, as here, a significant class size is at issue — Plaintiff's proposed collective includes more than 8,000 individuals — courts do not take this inquiry lightly by virtue of the significant burdens imposed on all of the parties by the scope of the requested relief. *See, e.g., Williams v. Accredited Home Lenders, Inc.*, 2006 U.S. Dist. LEXIS, at *12 n.4 (N.D. Ga. July 25, 2006) (noting that similarity requirement must be applied with "rigor" in large cases).

## II.   Plaintiff Cannot Establish That Examiners And Contractors In The Proposed Nationwide Collective Are Similarly Situated.

Plaintiff alleges that she and more than 8,000+ current and former Examiners and Contractors at 700 locations across the county were required to work without pay before and after their mobile medical exams. Specifically, Plaintiff claims that she was not paid for pre-exam work, which includes "call[ing] the people who [a]re scheduled to be examined, print[ing] out the required paperwork, and gather[ing] the supplies [they] need for the day." (Pl.'s Mem. at 4.) Plaintiff also alleges that she was not paid for any post-exam work, which includes spinning down blood, preparing it to be shipped, driving to a FedEx for drop-off, reviewing paperwork to make sure applicants have completed it correctly, and uploading completed paperwork for the

17

day. (*Id.* at 4-5.) These activities, Plaintiff claims, were all "off the clock," and resulted in ExamOne failing to pay her minimum wage or overtime. (*Id.* at 5.)

Here, Plaintiff's motion and supporting declarations fall far short of the requisite standard. Although Plaintiff offers conclusory, cookie-cutter declarations from 55 current and former Examiners and Contractors, she still fails to explain, either in her pleadings or supporting declarations, the *reason* why she was not compensated for certain tasks, let alone identify a company-wide policy that violates the FLSA. Moreover, as demonstrated by the declarations submitted by the parties, the experiences of Plaintiff and other putative class members are markedly different. Accordingly, this action is not susceptible to collective action treatment because Plaintiff cannot establish a factual nexus between herself and the putative collective that she seeks to represent.

**A.     The Court Should Not Consider Plaintiff's Vague, Identical Declarations.**

As a threshold matter, Plaintiff's cookie-cutter declarations should be disregarded because they merely repeat conclusory statements. *See Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 665 (S.D.N.Y. 2013) (statements in a declaration are deemed "conclusory where they fail to identify particular employees or make specific allegations"). Plaintiff's declarations have no probative value and, for that reason alone, Plaintiff has failed to make even the "modest factual showing" required for conditional certification. For example, the key allegation upon which Plaintiff's motion essentially rests is repeated *verbatim* in every single declaration that Plaintiff filed: "I feel that Defendants deliberately pay its examiners by the appointment and make them do unpaid work to save themselves money." (Pl.'s Memo. at 5.) In fact, Plaintiff even admits in her motion that the declarations are repetitive; indeed, in Footnote 4 on p. 4, she states "For ease

of reference, Plaintiffs primarily cite to the Brisky declaration. The other declarations are substantially similar." (*Id.* at 4.)

Courts routinely deny certification motions relying on such materials. *See, e.g., Mendoza v. Casa De Cambio Delgado, Inc.*, 2008 U.S. Dist. LEXIS 27519, *6 (S.D.N.Y. Apr. 7, 2008) (rejecting affidavits that "appear to be boilerplate and virtually identical"); *Feng v. Hampshire Times*, 2015 U.S. Dist. LEXIS 29899, at *3 (S.D.N.Y. Mar. 11, 2015) (denying certification where all seven affidavits contained one identical statement that the affiants were unaware of any other employees receiving overtime pay). For these reasons, the Court should disregard Plaintiff's declarations and deny her motion.

### B.     Plaintiff Has Not Identified A Single Decision, Policy, or Plan.

More importantly, Plaintiff has not pointed to a written policy requiring her to work without compensation — there is simply no such policy. To the contrary, ExamOne's policy expressly prohibits Examiners from working off-the-clock. Nor does Plaintiff even contend that she was directed or asked by management to work off the clock. Instead, Plaintiff only claims that she was not paid for performing certain tasks before and after mobile medical exams. Nothing more. All 55 of Plaintiff's witnesses declare:

> Because of this off-the-clock time, I have not [received/made] minimum wage and/or overtime.

> I feel Defendants deliberately paid their examiners by the appointment and made them do unpaid work to save themselves money.

(*See* Dkt. # 515, Ex. 1:1-1:15.)

It is not sufficient that Plaintiff merely alleges that she and the putative collective were required to work off the clock and were not paid minimum wage and overtime. Rather, she must show that she and the potential plaintiffs were victims of a common policy or plan that violated

the law. *See Mendoza*, 2008 U.S. Dist. LEXIS 27519, at *6-7 (denying conditional certification of off-the-clock claims because "not one Plaintiff affidavit purports a factual nexus with other putative employees" and there was a "lack of factual allegations in the affidavits or complaint to show that the Plaintiffs are similarly situated with the other employees"); *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 173-74 (W.D.N.Y. 2007) (denying plaintiffs' motion for conditional certification of off-the-clock claims even though plaintiffs submitted affidavits from employees stating they were not paid overtime, noting that they did not suggest that any of the violations were part of a company-wide policy, and the evidence was insufficient in light of the size of the proposed class).

Plaintiff's declarations do not meet this standard. In fact, it is unclear how or why Plaintiff's witnesses worked "off the clock" or did not receive minimum wage and overtime. The declarations do not, for example, explain the following:

- whether the individual was clocked in to the timekeeping system while he or she performed the tasks but was not compensated for that time (e.g., time sheets were altered to delete overtime hours worked);
- whether the timekeeping system would not let the individual clock in until the scheduled start time of his or her mobile exam;
- whether the timekeeping system automatically clocked the individual out at the scheduled start or end time of his or her mobile exam, even if the individual was still working;
- whether the individual's manager directed him or her to perform the pre- or post-exam tasks or other work without clocking in to the timekeeping system; or
- whether the individual reported his or her alleged off-the-clock activity to his or her manager or if the manager otherwise knew that the individual performed work for which he or she was not paid.

Remarkably, the declarations do not even describe how the Examiners' or Contractors' pre- and post-exam work was not encompassed by the "per appointment fee" that every declarant admitted he or she was paid. Nor do they contain even a single detail of what that "per appointment fee" was or how many hours they worked off the clock. The declarations also do not describe what timekeeping system Plaintiff Examiners used to record their time for payroll

purposes, or how they recorded their time in that system. Nor do Plaintiff's declarations identify a single week in which she or the declarants were not paid minimum wage or overtime, or attach a single piece of documentation, such as paystubs or timekeeping records, to support their bare-bones attestations. Plaintiff's declarations also do not detail (nor does Plaintiff's motion explain) why Contractors would be entitled to minimum wage or overtime in the first place.

The omissions in Plaintiff's declarations, however, were unlikely by mistake. If Plaintiff had provided more detail, it would have highlighted the differences among Examiners and Contractors (in addition to highlighting the fact that no FLSA violations have occurred). But Plaintiff cannot avoid her burden of demonstrating that she and the putative collective were subject to a company-wide practice by submitting, at best, vague declarations with no factual support. *See Reyes*, 2015 U.S. Dist. LEXIS 101728, at *1 (denying conditional certification motion premised only on a plaintiff's "bare assertion that other employees also worked overtime without compensation"); *Levinson v. Primedia Inc.*, 2003 U.S. Dist. LEXIS 20010, at *2 (S.D.N.Y. Nov. 6, 2003) (denying conditional certification where the plaintiffs merely alleged that they were not paid minimum wage or overtime, but provided no factual evidence other than the conjecture contained in the plaintiffs' affidavits that other employees were subject to the same pay policies). As this Court explained in *She Jian Guo v. Tommy's Sushi Inc.*, conclusory and unsupported assertions such as "failure to pay minimum wage and overtime" cannot support conditional certification because they are insufficient for the court to determine whether a factual nexus between the plaintiff and the putative collective exists:

> As to individuals employed in positions other than deliveryman, plaintiffs allege only that their co-workers were also not paid at the minimum wage rate and overtime rate. . . . These vague, conclusory, and unsupported assertions do not suffice. Plaintiffs' submissions do not contain any allegations regarding, for example, the specific hours worked by, or the amounts paid to, other employees. Although plaintiffs' burden at this stage is modest, it is not non-existent, and

21

certification is not automatic. Without more detailed factual allegations, the Court has no basis for concluding that all [defendant] employees were similarly situated victims of an illegal policy or plan.

*She Jian Guo v. Tommy's Sushi Inc.*, 2014 U.S. Dist. LEXIS 147981, at *8-9 (S.D.N.Y. Oct. 16, 2014) (denying conditional certification in part as to broad class of employees). In short, Plaintiff's declarations do not identify any single decision, policy, or plan that violates the FLSA, let alone a company-wide one to do so, and conditional certification should be denied.

## C.   Examiners' Testimony Shows Significant Difference Among Potential Collective Members.

The 21 declarations offered by ExamOne establish significant differences between the potential members of the proposed collective action. These declarations illustrate that Plaintiff's alleged experiences were the exception, rather than the rule. A small sampling of the declarations is set forth below:

- Melody Brosnan (Overland Park, Kansas): Contractor who performs mobile exams for ExamOne through her company, ProMedX LLC. Previously an Examiner who did mobile exams and worked at health fairs but chose to resign in May 2015 to enter an independent contractor agreement with ExamOne on behalf of her company, which is paid a percentage of the fee that ExamOne bills and collects per exam. Previously received 39% of ExamOne's collected fee, but subsequently negotiated changes to the contractor agreement to receive 49/50-60% of the collected fee (depends on the nature of the exam). Has contractors and three part-time employees who perform mobile medical exams for ExamOne. Pays employees $17.00 per exam plus an occasional travel bonus. Since ProMedX receives more than $17.00 from ExamOne per exam, makes a profit by using employees and contractors to perform exams. Does not record time with ExamOne as a Contractor, and decides which exams to perform and whether she or one of ProMedX's employees or contractors will perform the exam (ProMedX is not required to pick up any exams for ExamOne). Also performs exams and other work for different companies through ProMedX.[77]

- Denise Baca (Overland Park, Kansas): Examiner that primarily does mobile medical exams but occasionally works in the office and at health fairs.  Paid $19.29 per hour for work at the office and $25 per hour for health fairs (or $27 per hour if lead Examiner). Paid a set fee for mobile exams but paid $19.29 per hour for any work before and after the mobile exams. Works 20–29 hours per week and records time by calling a 1-800 number. For office work, clocks in when she gets there and clocks out when she leaves for the day. For health fairs, clocks in when she arrives at the health fair and clocks out when she leaves (unless she

---

[77] *See generally* Brosnan Dec.

needs to drop anything off, in which case she stays clocked in). For mobile exams, clocks in when she leaves her house and clocks out when she returns home after exams. Also clocks in when doing any pre-exam and post-exam work at home.[78]

- Jeffia McCallop (Overland Park, Kansas): Examiner that mostly does health fairs with occasional work at the office. Paid $25 per hour for health fairs and $16 per hour for office work. Hours per week vary based on the number of health fairs available but does not recall ever working over 40 hours per week. Records time by calling a 1-800 number. For health fairs or office work, clocks in when she leaves her house and clocks out when she returns.[79]

- Steven Komala (Austin, Texas): Examiner who does mobile exams, specialty medical exams (drug screening, alcohol test, and emergency alcohol and drug testing), and health fairs. Works 4-5 hours per day 6 days a week. Paid a set fee for mobile medical exams but if he has to travel farther or pay for parking, will get a bonus to cover the mileage or cost of parking. Paid $25 per hour for health fairs; a minimum of $90 for up to six patients and $15 extra for each additional patient (plus mileage) for drug testing; $35 per patient (plus mileage) for alcohol testing; $195 per call (plus mileage) for emergency testing. Clocks in and out by calling a 1-800 number. For mobile exams, clocks in and clocks out when finished with post-exam work. Does not clock in and out for pre-exam work. For health fairs, clocks in when he arrives and out when he leaves. For specialty medical exams, clocks in when he leaves his house and clocks out when he returns home.[80]

- Marina Gonzalez (Austin, Texas): originally worked as a Contractor and was paid 38% per exam based on the amount of money that insurance company paid ExamOne. Never recorded time as a Contractor and was never eligible for paid time off or other employee benefits. Simultaneously did medical exam work as a contractor for two other competitor companies. Became an Examiner in September 2013 and does a mix of mobile exams, health fairs, and office work. Paid a flat fee per mobile exam but gets a bonus if the appointment is 20+ miles outside her designated area. Paid $25 per hour for health fairs and $17.69 per hour for office work. Records time as an Examiner by calling a 1-800 number. For mobile exams, clocks in when she leaves her house for first exam and clocks out when she gets back home; will also clock out for large gaps in-between appointments. Does not clock in for pre- and post-exam work. For health fairs and office work, clocks in when she arrives at the health fair/office and clocks out when she leaves.[81]

- Bianca Alexander (St. Louis, Missouri): Examiner who does mobile exams and office work. Paid for mobile exams based on a fee schedule, but will receive a bonus or mileage if the exam is far away or if ExamOne received positive feedback about her exam. Paid $17.69 per hour for office work and for any training modules that she completes. Works 29 hours per week, and her manager makes sure she is not working more than 30 hours per week. Records time by calling a 1-800 number. For mobile exams, clocks in when she leaves her

[78] See generally Baca Dec.
[79] See generally McCallop Dec.
[80] See generally Komala Dec.
[81] See generally Gonzalez Dec.

house and does not clock out until she gets back home. For office work, clocks in when she arrives at the office and clocks out when she leaves.[82]

The above declarations are a small sampling of the Examiners who have submitted declarations in this case. Nevertheless, these declarations highlight that Examiners' experiences — including schedule, type of work, pay, and timekeeping — is extremely varied. Lest there be any doubt, ExamOne respectfully suggests that the Court compare and contrast some of the other declarations submitted with this brief with those submitted by Plaintiff. Those declarations (if, given their conclusory nature, they are believed) show that the alleged unpaid (off-the-clock) work of the Plaintiff was a rare occurrence and atypical of the experience of the nationwide class she seeks to certify. *See Eng-Hatcher v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 127262, at *14-17 (S.D.N.Y. Nov. 13, 2009) (denying conditional certification of nationwide collective where defendant's affidavits showed it discouraged employees from working overtime and that there were significant variables among defendant's store locations, and explaining that the minimal evidence submitted by plaintiff failed to meet the "modest factual showing" given the size and scope of plaintiff's requested nationwide collective).

The evidence submitted by ExamOne illustrates that Plaintiff and the proposed class members are not similarly situated. Accordingly, Plaintiff has not established a colorable basis for her claim that she and the putative class members were the victims of a single decision, policy, or plan that caused them to be deprived of minimum wage and overtime compensation. The Court should deny her motion for conditional certification.

## III.   The Form And Method Of Plaintiff's Proposed Notice Is Inadequate And Improper.

For the reasons set forth above, issuance of notice in this action would be inconsistent with the requirements of the FLSA. What's more, Plaintiff's counsel has already sent improper

---

[82] *See generally* Alexander Dec.

notice to the putative collective after ExamOne provided Examiners' contact information in July 2017. So issuing a new notice now would be futile. Nevertheless, should the Court determine that notice should issue, the form and method of the notice Plaintiff proposes is improper in several respects. Namely, it (i) fails to fully and accurately describe ExamOne's respective position as to the defenses asserted in this action; (ii) insufficiently defines the class and the class period; (iii) sets an overly lengthy time frame of 90 days to opt-in; (iv) unjustifiably requests e-mail notice; (v) unjustifiably requests reminder half-way through the opt-in period; and (vi) unjustifiably requests to call collective members for whom the home or e-mail address is "invalid." *See Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340 (E.D.N.Y. 2012) (denying request for reminder notice because plaintiffs did not identify a reason why the reminder notice was necessary); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451-52 (S.D.N.Y. 2011) (noting a 60 day opt-in time frame "is more consistent with FLSA practice"); *Michael v. Bloomberg L.P.*, 2015 U.S. Dist. LEXIS 51030 (S.D.N.Y. April 17, 2015) (restricting telephone numbers because of privacy concerns unless plaintiffs could show that a large number of notices were returned as undeliverable). In the event the Court grants Plaintiff's motion in whole or in part, the Court should order the parties to meet and confer in good faith to draft a mutually agreed-upon notice that can be jointly submitted to the Court for approval. In the event the parties cannot agree, ExamOne respectfully requests the opportunity to submit its own proposed notice.

## CONCLUSION

Based on the foregoing, ExamOne respectfully requests that the Court deny Plaintiff's Motion for Conditional Certification of the Fair Labor Standards Act Collective and Issuance of Court-Approved Notice.

**DATED:**  November 20, 2017

Respectfully submitted,

/s/ Arthur J. Rooney
Arthur J. Rooney (admitted *pro hac vice*)
Laura E. Zabele (LZ-3238)
Baker & McKenzie LLP
300 E Randolph Street, Suite 5000
Chicago, IL  60601
+ 1 312 861 8000
+ 1 312 861 2899 (facsimile)

Robert P. Lewis (RL-6321)
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY  10018
+1 212 626 4100
+1 212 310 1600 (facsimile)

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of November, 2017, a copy of Defendants' Response In Opposition To Plaintiff's Motion For Conditional Certification Of The Fair Labor Standards Act Collective And Issuance Of Court-Approved Notice was filed with the Clerk of Court and served on all counsel of record via the Court's electronic case filing (CM/ECF) system.

<u>/s/ Arthur J. Rooney</u>