UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA VECCHIO, individually and on
behalf of all others similarly situated,

                                    Plaintiff,

        -against-

QUEST DIAGNOSTICS INC.,
EXAMONE WORLD WIDE, INC., and
EXAMONE LLC,

                                    Defendants.

Civil Action No. 1:16-cv-05165-ER-KNF

The Honorable Judge Edgardo Ramos
Magistrate Judge Kevin Nathaniel Fox

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR DECERTIFICATION

Arthur J. Rooney (admitted *pro hac vice*)
**Baker & McKenzie LLP**
300 E Randolph Street, Suite 5000
Chicago, IL 60601
+ 1 312 861 8000
arthur.rooney@bakermckenzie.com

Robert P. Lewis (RL-6321)
**Baker & McKenzie LLP**
452 Fifth Avenue
New York, NY 10018
+1 212 626 4100
robert.lewis@bakermckenzie.com

Attorneys for Defendants

## **TABLE OF CONTENTS**

**Page No.**

INTRODUCTION ................................................................................................ 1

PROCEDURAL BACKGROUND........................................................................ 2

STATEMENT OF FACTS ................................................................................... 2

    I.   ExamOne's Business. ................................................................................ 2

    II.   Examiners' Job Duties, Locations, Schedules, and Hours Vary................................ 3

    III.   ExamOne's Pay Structure Depends on the Work an Examiner Performs and the Location. ................................................................................ 5

    IV.   ExamOne Explains Its Pay Structure to Examiners Through Policies, Training, and On-Boarding Documents. ................................................................................ 6

    V.   ExamOne's Policies Provide For Minimum Wage And Overtime Pay..................... 7

    VI.   ExamOne's Timekeeping Policies Prohibit Unpaid Work. ....................................... 8

    VII.   ExamOne's Timekeeping Practices Vary. ............................................................. 9

ARGUMENT ....................................................................................................... 10

    I.   Legal Standard. ....................................................................................... 10

    II.   Disparate Factual and Employment Circumstances Warrant Decertification. ......... 11

        A.   There is No Evidence of a Common Unlawful Policy, Plan, or Practice to Bind Plaintiffs. ............................................................................... 11

        B.   Plaintiffs Are Not Similarly Situated Because Some Are Employees, Some Are Contractors, And Some Started As Contractors But Became Employees. ............................................................................ 14

        C.   Varying Testimony Among The Plaintiffs Demonstrates Individualized Situations....................................................................................... 16

            1.   Plaintiffs Are Not Similarly Situated With Respect to Travel Time........16

            2.   Plaintiffs Are Not Similarly Situated With Respect To Time Spent on Pre-Exam Work. ......................................................................17

            3.   Plaintiffs Are Not Similarly Situated With Respect To Time Performing Medical Exams. ...................................................19

            4.   Plaintiffs Are Not Similarly Situated With Respect To Post-Exam Work Time...........................................................................22

i

5.   Plaintiffs Are Not Similarly Situated With Respect To Their
Timekeeping Practices...........................................................................22

6.   Plaintiffs Are Not Similarly Situated With Respect To Working
Overtime. ..............................................................................................24

III.   Defendants Have Individualized Defenses for Each Plaintiff and Claim................. 25

A.   ExamOne Has Individualized Defenses To Plaintiffs' Employment Status... 26

B.   ExamOne Has Individualized Defenses To Plaintiffs' Overtime Claims....... 26

C.   ExamOne Has Individualized Defenses To Plaintiffs' Minimum Wage
Claims. .................................................................................................. 27

IV.   Fairness And Procedural Considerations Compel Decertification. ......................... 28

CONCLUSION...................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page No.(s)**

### **Cases**

*Barry v. Town of Elma*,
 No. 02-344, 2005 U.S. Dist. LEXIS 5548 (E.D.N.Y. Mar. 25 2005)......................................26

*Crawford v. Prof'l Transp., Inc.*,
 No. 14-18, 2017 U.S. Dist. LEXIS 41545 (S.D. Ind. Mar. 22, 2017) ....................................13

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
 27 F. Supp. 3d 313 (E.D.N.Y. 2014) ....................................................................11, 13, 29, 30

*Griffith v. Fordham Fin. Mgmt.*,
 No. 12-1117, 2016 U.S. Dist. LEXIS 10459 (S.D.N.Y. Jan. 28, 2016) .....................10, 11, 14

*Hernandez v. Fresh Diet, Inc.*,
 No. 12-4339, 2014 U.S. Dist. LEXIS 139069 (S.D.N.Y. Sept. 29, 2014)..............................16

*Kuebel v. Black & Decker, Inc.*,
 643 F.3d 352 (2d Cir. 2011)...........................................................................................13, 27

*Lynch v. City of New York*,
 No. 16-5677, 2017 U.S. Dist. LEXIS 178855 ..................................................................11, 12

*Myers v. Hertz Corp.*,
 624 F.3d 537 (2d Cir. 2010)...........................................................................................11, 16

*Reed v. County of Orange*,
 266 F.R.D. 446 (C.D. Cal. 2010) .........................................................................................19

*Ruiz v. Citibank, N.A.*,
 93 F. Supp. 3d 279 (S.D.N.Y. 2015).............................................................................13, 16

*Saleem v. Corp. Transp. Grp., Ltd.*,
 52 F. Supp. 3d 526 (S.D.N.Y. 2014).....................................................................................15

*Schwind v. EW & Assocs.*,
 357 F. Supp. 2d 691 (S.D.N.Y. 2005)...................................................................................15

*Shayler v. Midtown Investigations, Ltd.*,
 No. 12-4685, 2013 U.S. Dist. LEXIS 29540 (S.D.N.Y. Feb. 27, 2013)..................................14

*Stevens v. HMSHost Corp.*,
 No. 10-3571, 2012 U.S. Dist. LEXIS 146150 (E.D.N.Y. Oct. 10, 2012)................................11

*Stevens v. HMSHost Corp.*,
   No. 10-3571, 2014 U.S. Dist. LEXIS 119653 (E.D.N.Y. Aug. 26, 2014)..............................29

*Thind v. Healthfirst Mgmt. Servs., LLC*,
   2016 U.S. Dist. LEXIS 170503 (S.D.N.Y. Dec. 9, 2016) ..................................................12, 25

*Zivali v. AT&T Mobility, LLC*,
   784 F. Supp. 2d 456 (S.D.N.Y. 2011)............................................................................. *passim*

## **Statutes**

29 U.S.C. §§ 201 *et seq.* (Fair Labor Standards Act ("FLSA")) ........................................... *passim*

29 U.S.C. § 216(b) .........................................................................................................1, 10, 30

29 C.F.R. § 778.109 ....................................................................................................................5

## INTRODUCTION

The Court should decertify the collective action that the Court conditionally certified under the Fair Labor Standards Act ("FLSA") because Plaintiff Maria Vecchio ("Vecchio" or "Plaintiff") has not satisfied, and cannot satisfy, her heightened burden to prove that she and the individuals who opted into this action ("Opt-In Plaintiffs") are similarly situated. Extensive discovery has revealed Plaintiffs' working experiences differ markedly, and that there is no common proof to establish the nature, frequency, or duration of any alleged unpaid work, overtime or minimum wage violations, or damages. Some Opt-In Plaintiffs never experienced the alleged unlawful conduct, while others claim, incredibly, that the alleged unlawful conduct always happened. Still others could not recall any facts to support their theories of liability.

In this case, Vecchio alleged the existence of a "company-wide policy of making Plaintiffs perform off-the-clock work" (ECF No. 514), but the facts elicited during discovery demonstrate that no such common proof exists and that the opposite is true. Defendants have lawful policies that some Plaintiffs followed and others violated. The only common ground is Plaintiffs' concessions that their schedules, hours, timekeeping practices, and compensation widely varied. Given the myriad influences on each Examiner's working activities and the degree of freedom their positions afforded, there is no sensible way to litigate Vecchio's and the Opt-In Plaintiffs' overtime and minimum wage claims as a collective action. It would be impossible and patently unfair to Defendants Quest Diagnostics Inc., ExamOne World Wide, Inc., and ExamOne LLC (collectively, "ExamOne" or "Defendants") to extrapolate the varied experiences of the deposed Opt-In Plaintiffs to all 2,940 Opt-In Plaintiffs. Resolving the issues collectively would require multitudes of mini-trials. The materially disparate factual circumstances, highly individualized defenses available to Defendants, and the relevant fairness and procedural concerns compels decertification under 29 U.S.C. § 216(b).

## PROCEDURAL BACKGROUND

On June 29, 2016, Vecchio filed this lawsuit asserting claims of unpaid minimum wage and overtime under the FLSA. (ECF No. 1, Counts I & III.)[1] Since October 2017, nearly 3,000 individuals opted-into this lawsuit. On April 30, 2018, the Court granted Vecchio's request to conditionally certify her FLSA collective action, finding that Vecchio made a sufficient "modest factual showing" at the first stage to issue notice. (ECF No. 644 pp. 7, 19.) Ultimately, 2,940 individuals opted-into this lawsuit.  (ECF No. 3131.) The parties completed pre-trial discovery on January 21, 2020. (ECF No. 3165.)

## STATEMENT OF FACTS

### I.    ExamOne's Business.

ExamOne is the largest provider of risk assessment services for life insurance companies in North America. (Ex. 12[2], Deposition of Rick Kingcade ("Kingcade Dep."), 31:2-18.) ExamOne helps insurers meet their underwriting needs by providing convenient specimen collection for policy applicants via mobile, in-home or in-office, phlebotomy, medical exam and courier services. (ECF No. 541 ¶ 2.) To this end, ExamOne relies on Examiners to collect specimens and perform physical and medical exams for ExamOne's clients. (R. Kingcade Dep. 33:3-9, 35:15-22.)

ExamOne engages employees and independent contractors ("Contractors") (collectively, "Examiners") to perform exams. (Ex. 14, Deposition of Jane Strohm ("J. Strohm Dep."), 11:24-12:1; R. Kingcade Dep. 34:7-17.) An Examiner's classification as an employee or a contractor influences work practices, schedule, and compensation. For example, Contractors do not record their time, they provide their own tools and equipment, some operate as companies, some perform

---

[1] Vecchio initially asserted wage and hour claims under both the FLSA and New York law, but voluntarily dismissed her state law claims and this action advances exclusively under the FLSA.

[2] Unless otherwise designated with a prior ECF number, all cited **numbered** exhibits are those attached to the Declaration of Arthur J. Rooney ("Rooney Dec."), filed simultaneously with this Motion.

medical exam work for ExamOne's competitors or other companies, and some utilize subcontractors to perform exams. (Ex. 10, Deposition of Renee Cessner ("R. Cessner Dep."), 11:4-6; Ex. 32, Deposition of Cynthia Estep ("C. Estep Dep."), 51:11-12 ("So as an independent contractor, you never clock in or out."); Ex. 33, Deposition of Nancy Fagan ("N. Fagan Dep."), 33:2-16 (admitting she uses same supplies for work with ExamOne and other competitors); Ex. 61, Deposition of Bernadette Rodriguez ("B. Rodriguez Dep."), 34:8-35:10 (testifying she deducted expense for supplies she purchased on taxes); Ex. 29, Deposition of Lisa Dunn ("L. Dunn Dep."), 4:19-21 ("I'm not employed by them. I'm actually – I have my own LLC, so the checks they give me are made out to my LLC."); Ex. 24, Deposition of Rut Contreras ("R. Contreras Dep."), 17:2-7 ("Q. So while you were working for ExamOne, you also worked for two other companies. A. Yes."); Ex. 75, Declaration of Melody Brosnan ("M. Brosnan Dec."), ¶ 7 ("I personally perform some of the mobile medical exams through my company. But I also employ other examiners through ProMedEx to perform exams for ExamOne.  I've also used contractors to perform these exams.").)

Contractors may also receive a higher fee for work by negotiating the terms. (L. Dunn Dep. 47:15-18 ("[E]xaminers they hire nowadays get paid a set fee . . . Whereas me, I'm paid at, like, a 40 to 45 percentage rate."); Ex. 64, Deposition of Ellora Jane Shelton ("E. Shelton Dep."), 14:14-17 ("Q. How were you paid when you performed mobile exams? A. Commission. 55 percent work that they gave me, 75 percent work that I gave them.").)

## II.   **Examiners' Job Duties, Locations, Schedules, and Hours Vary.**

Examiners perform a battery of physical exams and specimen collections for insurance policy applicants. The exams can range from simply completing paperwork and taking physical measurements to taking comprehensive paramedical histories with blood draws, EKGs, urine specimen collections, and older age supplements. (Ex. 1, Standards and Protocols Manual for

Examiners ("Protocols Manual"), pp. 7-8.) Mobile exams involve work before and after the exams, including pre-exam work (*e.g.*, calls to applicants), travel to and from the applicants' homes or offices, and post-exam closure work. (R. Cessner Dep. 16:6-14, 37:24-39:21; Ex. 11, Deposition of Danielle Dunbar ("D. Dunbar Dep."), 68:9-69:23.) Examiners have a designated area for mobile exams based on zip codes they provide to ExamOne. (D. Dunbar Dep. 63:15-24.) Examiners choose whether to accept appointments outside their designated area. (*Id.* at 127:15-128:8.)

Examiners classified as employees work part-time and are ***not*** supposed to work more than 30 hours per week. (R. Kingcade Dep. 80:8-9; J. Strohm Dep. 10:8-9, 11:9-12; D. Dunbar Dep. 32:10-11.) Many Opt-In Plaintiffs confirmed they worked only part-time for ExamOne and held other jobs. (*See, e.g.*, Ex. 38, Deposition of Alexis Harris ("A. Harris Dep."), 17:1-2 ("Q. ExamOne is your part-time job? A. It is."); Ex. 28, Deposition of Maureen Dickinson ("M. Dickinson Dep."), 15:13-14 ("I tried to keep it as part-time as possible."); Ex. 50, Deposition of Brenda Martin ("B. Martin Dep."), 52:17-20 ("ExamOne was a part-time job."), *id.* at 52:21-25 (ExamOne told Examiners "not to work over 30 hours"); Ex. 57, Deposition of Carmella Pope ("C. Pope Dep."), 10:13-15 (testifying she never worked full-time); Ex. 20, Deposition of Crystal Broady ("C. Broady Dep."), 44:20, 52:21-23 (full-time employee at hospital and "part-time" for ExamOne); Ex. 35, Deposition of Christine Gee ("C. Gee Dep."), 48:20-24 (full-time employee at hospital).)

The Examiners' hours also fluctuate because they control the number of exams they perform. Some Examiners chose to complete only one to three exams a week; others would conduct as many as 15 exams in a day. (Ex. 60, Deposition of Delanda Robertson ("D. Robertson Dep."), 15:10-13 (performed "one, two or three [exams] a week"); Ex. 62, Deposition of Ann Schaefer ("A. Schaefer Dep."), 22:21-23:12 ("Q. How many exams did you perform, on average, per week?...A. Okay. Oh, gee, maybe two to four."); Ex. 22, Deposition of Macheall Christion-

Amador ("M. Christion-Amador Dep."), 18:1-2 ("Q. How many exams do you typically have in a day? A. Two or three. Have you ever had a day where you've only had one exam? A. Yes."); M. Dickinson Dep. 15:11-14 ("Q. How many exams would you typically have in a day? A. Maybe two or three, sometimes just one. I tried to keep it as part-time as possible."); Ex. 58, Deposition of Jacqueline "Jackie" Ramirez ("J. Ramirez Dep."), 18:7-10 ("anywhere from five to 15 exams per day."); Ex. 53, Deposition of Reshondra Parks ("R. Parks Dep."), 19:2-15 (would have "[b]etween ten and 15" exams per day on the weekend).)

## III.   ExamOne's Pay Structure Depends on the Work an Examiner Performs and the Location.

ExamOne's pay structure includes multiple components: fee-for service pay, an hourly rate of pay, an overtime rate of pay, bonus compensation, and mileage reimbursement. ExamOne pays Examiners on a fee-for-service basis for mobile exams.[3] (R. Kingcade Dep. 36:12-19; Ex. 13, Deposition of Edwin Snider ("E. Snider Dep."), 13:4-6.) The fee varies by the length of the exam, the complexity of the service, and an Examiner's skillset, which ExamOne incorporates into a multi-level (or "tier") fee schedule. (R. Kingcade Dep. at 40:4-21; E. Snider Dep. 23:23-24:2.) The fees for each type of exam can vary. (*Id.* at 47:21-48:25, 49:21-50:9.) ExamOne also pays Examiners a set hourly rate for work performed in an office *and* overtime when an Examiner works 40 or more hours. (R. Kingcade Dep. 55:20-25.) Further, ExamOne's pay structure includes bonus pay. (A. Harris Dep. 54:9-55:7; C. Pope Dep. 49:24-50:4; C. Estep Dep. 65:10-22.) Examiners can receive a discretionary bonus for exams that are far away from an Examiner's designated area, complex, involve extra paperwork, or for a client's positive feedback; or a "no show" bonus if an

---

[3] The FLSA "does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis." 29 C.F.R. § 778.109. Here, ExamOne Examiners a fee for service, akin to a piece rate payment system, for each exam they complete. (J. Strohm Dep. 31:20-32:18.) This fee includes all work associated with a particular exam, including pre-exam work, travel, and post-exam work. (*Id.* ("[T]o pay them the fee for service, we need to know they completed the work. Factored into that fee for service is the work they do, so we need to track their time to know what they're doing."); E. Snider Dep. 14:4-15:6).)

applicant misses an appointment. (R. Kingcade Dep. 66:10-16; Ex. 15, Deposition of Paul Walker ("P. Walker Dep."), 39:6-12; E. Snider Dep. 36:8-22; R. Cessner Dep. 47:19-48:1.) ExamOne's pay structure also includes reimbursement for mileage to travel to a distant exam. (R. Kingcade Dep. 66:10-18; *see also* C. Gee Dep. 64:2-5.)

ExamOne's pay structure differentiates between independent contractors and employees. ExamOne pays its employees based on set fee-for-service tiers, while Contractors negotiate their pay arrangements. (R. Kingcade Dep. 36:23-8; L. Dunn Dep. 47:8-48:22 (negotiated rate of 45% for ExamOne exams); E. Shelton Dep. 14:14-19:14 (describing pay structure of 55% commission on exams ExamOne arranged and 75% commission on exams she originated).) Examiners classified as independent contractors also negotiate changes to their contract and, consequently, their pay.  (*See, e.g.*, M. Brosnan Decl. ¶ 6 (describing pay structure; "I believe I originally received 39% of the fee ExamOne collected for each exam, and now I receive between 49% or 50% and 60% of the fee ExamOne collected (depending on the nature of the exam).") Contractors receive an agreement that explains the method of payment. (*See* Ex. 6, Vecchio Independent Contractor Agreement ("Contractor shall be paid a set fee for each service provided on behalf of ExamOne, as defined in the attached Fee Schedule.").)

## IV.    ExamOne Explains Its Pay Structure to Examiners Through Policies, Training, and On-Boarding Documents.

ExamOne provides its Examiners detailed information regarding compensation at the time ExamOne hires or engages an individual to perform exams. (*See, e.g.*, Ex. 7, Vecchio Offer Letter.) ExamOne also trains its managers to inform Examiners that the pay for mobile exams is "fee for service," while an "hourly wage [is] used for training and work in the office." (*See* Ex. 2, ExamOne Examiner Communication for On-Call Employed Examiners, p. 2.)

## V.   **ExamOne's Policies Provide For Minimum Wage And Overtime Pay.**

Although most Examiners are part-time employees, ExamOne's policies require, and ExamOne pays, overtime if an Examiner works 40 or more hours:

> Quest Diagnostics will pay overtime, as required by law, when non-exempt employees work more than 40 hours in a work week. Non-exempt employees are paid one and one-half times the regular hourly rate for all hours worked in excess of 40 hours in a work week . . .

(Ex. 3, ExamOne Employee Handbook Compensation Policies ("ExamOne Handbook Policies"), p. 9; *see also* R. Kingcade Dep. 112:7-9.) Employees should obtain approval before working overtime. (ExamOne Handbook Policies, p. 9.) From 2016 to 2019, ExamOne paid over $218,400 in overtime payments to Examiners. (Declaration of Kimberly C. Maletto[4] ("Maletto Dec.") at ¶¶ 6, 12-18.) Indeed, even Vecchio received overtime payments.  (*Id.* at ¶ 15.)

ExamOne also makes clear that it intends to pay Examiners at least the minimum wage and for all hours worked. (E. Snider Dep. 27:13-16, 38:5-16.) If an Examiner spends time on a service such that the fee-for-service is below minimum wage, ExamOne provides the Examiner a "true up"—*i.e.*, a payment of the difference between the fee for a particular service and the minimum wage rate for the time an Examiner actually spent to complete that service. (R. Kingcade Dep. 101:12-23; Ex. 46, Deposition of Carol Kappenhagen ("C. Kappenhagen Dep."), 18:11-17 ("[T]hey told us we would get paid, you know, whatever – whatever was the difference either our jobs or the – you know, like the minimum wage to make sure we were covered for our time."); P. Walker Dep. 71:2-72:14 (testifying that edits are made to Examiners' time entries to accurately capture the amount of time Examiners worked).) The true up raises the employee to the minimum wage. (R. Cessner Dep. 83:1-10.) Since 2016, ExamOne has provided more than 6,700 true ups

---

[4] The Declaration of Kimberly C. Maletto ("Maletto Dec.") is filed simultaneously with this Motion.

and paid more than $416,000 in true ups. (Maletto Dec. at ¶¶ 6-11; *see also* Ex. A[5], True-Up

Paystubs for Opt-In Plaintiffs.)

**VI.**     **ExamOne's Timekeeping Policies Prohibit Unpaid Work.**

Examiners record their time using ExamOne's electronic attendance and timekeeping

system, Workforce Central Teletime ("Teletime"). (Kingcade Dep. 90:14-91:1.) To clock in and

out using Teletime, Examiners call a 1-800 number, enter their employee ID and password, and

then press the "#" key or hang up – a process that takes a few seconds to a minute to complete.

(Ex. 5, ExamOne Teletime PowerPoint, p. 2.) Some Examiners testified they instead recorded their

time on paper timesheets they would submit to ExamOne. (D. Robertson Dep. 35:13-36:9.)

ExamOne maintains a lawful written policy on timekeeping that requires its Examiners to

record all time worked: **"Examiners are required to clock in/out any time you are working for**

**ExamOne. Failure to clock in/out can result in disciplinary action. Repeat offenses may result**

**in termination."** (Ex. 4, ExamOne Expectations and Protocols for On-Call Examiners, p.1

(emphasis added).) ExamOne's policies make clear that Examiners must clock in *any time* they

perform work for ExamOne. (J. Strohm Dep. 13:10-14:1; 21:10-14 (if Examiners are "clocking in

and out" and are eligible for overtime, "they calculate and pay that overtime via our payroll

system."); *id.* at 26:5-10 ("There shouldn't be work off the clock as a mobile examiner . . . we ask

them to clock in for all the work they perform for ExamOne."); P. Walker Dep. 23:21-25 ("A.

[O]ur policy is if you're doing work for the company, you're clocked in, you're on the clock. Q.

Has that always been your time-keeping policy? A. Yes."); E. Snider Dep. 53:24-54:4 (Examiners

"clock in and out when they're working for us, so we have a backup, so to speak. . .").)

ExamOne takes its timekeeping policy seriously and recognizes the implications of

---

[5] Unless otherwise designated with a prior ECF number or a numbered exhibit, all cited *lettered* exhibits are those attached to the Maletto Dec.

inaccurate time records. When Examiners fail to use the timekeeping system, ExamOne reminds them it is mandatory and they must report all time consistently:

> I can't stress how important it is to make sure you are punching in and out properly . . . you will punch in and out anytime you are doing work for ExamOne. If you are completing exams you will punch in when you leave your home and stay punched in until you complete your paperwork and centrifuging.

(*See* Ex. 8, N. McCartney Email; Ex. 9, B. Wheeler Email, ("Punching with Teletime is not optional."); A. Harris Dep. 110:11-111:14 (describing reminder e-mails, "hey, guys, don't forget to clock in and clock out, and also clock in and clock out ***not only for exams*** but also when you're doing work outside of it" (emphasis added)).)

## VII.   ExamOne's Timekeeping Practices Vary.

Examiners' timekeeping practices vary for two reasons in particular. First, despite ExamOne's clear policies to record all time worked using Teletime, some Examiners follow the policies, clocking in whenever they performed any work for ExamOne, and others violated the policy or recorded time sporadically. (ECF No. 555, ¶ 4 ("Because I am not comfortable using ExamOne's timekeeping system, I record my hours worked on a paper timesheet. I then type up my timesheets each week and give them to my Branch Manager, Angela Crane…I always record all of my hours worked on my timesheets. And no one at ExamOne has ever told me not to record all of my work time."); C. Kappenhagen Dep. 90:8-91:25 (describing that she punched in for pre-exam work, exams, travel between exams, and post-exam work); A. Harris Dep. 99:14-101:7 (testifying she only recorded her time 60 percent of the time; "[i]t – it just became natural not to think about it because I'm not getting paid hourly"); Ex. 42, Deposition of Lisa Hughes ("L. Hughes Dep."), 85:5-7 ("I have several e-mails in reference to not punching. So you would have to do a time sheet to say the punches."); Ex. 40, Deposition of Terra Hollins ("Hollins Dep."), 78:6-8 ("sometimes I was – couldn't remember if I clocked in or out, so I would just send [my

manager] an e-mail so she would look at it."); Ex. 63, Deposition of Catherine Seemer ("C. Seemer Dep."), 27:4-28:15 (never heard of Teletime and did not record her time).) Moreover, even when Examiners actually utilized the timekeeping system, what they did and did not record varied. (*See, e.g.*, Ex. 45, Deposition of Fatmata Kanu ("F. Kanu Dep."), 35:17-20 (clocked in for mobile exam at applicant's house); C. Gee Dep. 56:20-22 (clocked in for mobile exam when leaving her house); T. Hollins Dep. 75:11-19 (clocked out when she arrived home); Ex. 43, Deposition of Shelley Johnson ("S. Johnson Dep."), 25:3-9 (clocked out when she had everything faxed and packed).)

Second, timekeeping practices differ between employees and Contractors; employees must record all hours worked, while Contractors do not clock-in and are paid a negotiated rate based on their contract. (E. Shelton 104:19-106:10 (did not record her hours for ExamOne, did not use Teletime, and instead recorded mileage but not times related to exams); Ex. 31, Deposition of Eulanda Ellis ("E. Ellis Dep."), 18:13-16 ("Q. I'm asking if you actually recorded your hours worked or time worked while you worked for ExamOne. A. Not all the time…Simply because of at that time as an independent contractor, we weren't really told that we were being paid by hours. So my main concentration was not by hours; my main concentration was the applicants, the examinations that I had to do."); M. Brosnan Decl. ¶ 9 ("Although I used to record all of my hours worked for ExamOne while I was an employee, I stopped recording my hours worked when I entered into an independent contractor agreement with ExamOne.").)

## ARGUMENT

## I.   Legal Standard.

An FLSA collective action can be maintained only on behalf of the named plaintiff and alleged employees who are "similarly situated." *See* 29 U.S.C. § 216(b); *Griffith v. Fordham Fin. Mgmt.,* No. 12-1117, 2016 U.S. Dist. LEXIS 10459, *6 (S.D.N.Y. Jan. 28, 2016)*. At the "lenient," initial notice stage, Vecchio had to make only a "modest" showing of "some factual nexus"

connecting her to the potential opt-in plaintiffs. *See Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010). By contrast, at the decertification stage, the standard is much higher, and the Court examines with "heightened scrutiny" whether Plaintiffs are similarly situated. *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014); *Griffith*, 2016 U.S. Dist. LEXIS 10459, at *7 (at the decertification stage, "the court applies a more stringent standard of proof.").

At the decertification stage, courts consider "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (internal quotation and citation omitted). Vecchio must meet the more "stringent standard" of proof and show that she and the Opt-In Plaintiffs are similarly situated by a preponderance of the evidence. *Id.*; *see also Griffith*, 2016 U.S. Dist. LEXIS 10459, at *6-7 ("Plaintiffs bear the burden of proving that the opt-ins are similarly situated."); *Lynch v. City of New York*, No. 16-5677, 2017 U.S. Dist. LEXIS 178855, *7 (at decertification, "[t]he burden is on the plaintiffs to prove that all class members are similarly situated."). Where the Opt-In Plaintiffs are not similarly situated, the Court must decertify the collective action and dismiss their claims. *Id.* Also at the decertification stage, the individualized inquiry involved in credibility questions favors decertification. *See Stevens v. HMSHost Corp.*, No. 10-3571, 2012 U.S. Dist. LEXIS 146150, *11-12 (E.D.N.Y. Oct. 10, 2012) (credibility determinations are appropriate at the second stage after discovery).

## II.     Disparate Factual and Employment Circumstances Warrant Decertification.

### A.     *There is No Evidence of a Common Unlawful Policy, Plan, or Practice to Bind Plaintiffs.*

It no longer suffices for Vecchio and the Opt-In Plaintiffs to make conclusory assertions that they are "similarly situated" because they were allegedly "required" to work off-the-clock and did not receive minimum wage or overtime pay. (*See, e.g.*, ECF No. 514, pp. 1-2, 7.) "Plaintiffs' burden, at this stage, is to make a persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation." *Lynch*, 2017 U.S. Dist. LEXIS 178855, at *11 (internal citations omitted). After extensive discovery, Plaintiffs have not established, and cannot establish, any overarching policy or plan requiring work without compensation. In fact, Plaintiffs' testimony belies any such claim. ExamOne's policies prohibited unpaid work; consequently, ExamOne provided and expected Plaintiffs to use Teletime to record all time worked, and ExamOne issued minimum wage true-up payments and overtime pay where appropriate. Simply put, the evidentiary record confirms that ExamOne had no practice of failing to pay Plaintiffs minimum wages and overtime.

The variation in the Opt-In Plaintiffs' deposition testimony shows their claims do not stem from a systematically applied unlawful policy or practice, and that analysis of their claims for overtime and minimum wage requires an individualized assessment. *See Thind v. Healthfirst Mgmt. Servs., LLC*, 2016 U.S. Dist. LEXIS 170503, *8 (S.D.N.Y. Dec. 9, 2016) (granting decertification where "[g]iven the factual differences among the opt-in plaintiffs, [the named plaintiff] cannot demonstrate that [defendant] employed a single, uniform policy of explicitly directing Facilitated Enrollers to work off the clock in violation of its clear written policy"); *Zivali*, 784 F. Supp. 2d at 468 ("In the absence of a company-wide policy or practice…it is clear that [defendant's] potential defenses in this case will be highly fact specific. Accordingly, this factor weighs heavily against proceeding with this case as a collective action."). "Because Plaintiffs have

12

not shown a common policy that operated to common effect, or some other mode of evidencing shared experiences, they cannot proceed as a collective action." *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 300 (S.D.N.Y. 2015); *see also DeSilva*, 27 F. Supp. 3d at 320 (plaintiffs "failed to identify any unlawful system-wide policy or practice" applied uniformly to each named plaintiff where the official timekeeping and overtime compensation policies complied with the FLSA).

The evidence demonstrates the opposite of any overarching policy or plan requiring work without compensation. ExamOne instituted reasonable time reporting procedures to help it track employees' work hours. Some Plaintiffs followed those policies, recording all time they performed any work. (C. Kappenhagen Dep. 90:8-91:25; Ex. 51, Deposition of Veronica Morrison ("V. Morrison Dep."), 37:15-39:15.) But many other Plaintiffs made a personal choice to ignore ExamOne's policies and systems. (M. Christion-Amador Dep. 12:2-4 (testifying she chose not to use Teletime); Ex. 65, Deposition of Teri Skelton ("T. Skelton Dep."), 40:7-13, 44:12-12 (describing inconsistent use of Teletime); R. Parks Dep. 72:19-73:6 (made personal choice to work without clocking in or out); Ex. 55, Deposition of Holly Pitzer ("H. Pitzer Dep."), 48:2-11 (clocking in was "a hit and miss with me. I mean, I wasn't very – I wasn't very good at that…I didn't think it mattered").) Plaintiffs cannot now blame ExamOne for failing to pay them overtime or minimum wage when they violated ExamOne's lawful policies promulgated to ensure Plaintiffs were paid earned overtime and minimum wage, thus preventing ExamOne from being able to obtain the true facts regarding the time Plaintiffs actually worked for ExamOne. *See Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) ("To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had *actual or constructive knowledge of that work*.") (emphasis added); *see also Crawford v. Prof'l Transp., Inc.*, No. 14-18, 2017 U.S. Dist. LEXIS

41545, *25 (S.D. Ind. Mar. 22, 2017) (granting decertification because "there is no common policy or practice alleged to violate the FLSA that underlies the claims of the collective class" and "an individualized inquiry" into why each opt-in plaintiff "chose to ignore the policy, would be required to determine both liability and damages. This type of individualized inquiry is not suitable for class certification.").

### B. Plaintiffs Are Not Similarly Situated Because Some Are Employees, Some Are Contractors, And Some Started As Contractors But Became Employees.

Some Examiners are employees, some are independent contractors, and some started as independent contractors but became employees. Determining whether Plaintiffs were employees or independent contractors cannot be resolved on a collective basis. *See Griffith,* 2016 U.S. Dist. LEXIS 10459, at *8 ("Determining whether Plaintiffs were employees or independent contractors is not capable of resolution by classwide proof, and will instead require highly individualized inquiries."); *Shayler v. Midtown Investigations, Ltd.,* No. 12-4685, 2013 U.S. Dist. LEXIS 29540, *27 (S.D.N.Y. Feb. 27, 2013) ("The inquiry as to whether an individual is an independent contractor or employee is fact specific and may be employee specific."). Resolving Plaintiffs' claims requires individualized inquiry to each Plaintiffs' circumstances, including their classification status, which results in varying terms of engagement, degree of control, investment in equipment and supplies, use of own employees, work for other companies, compensation, tax treatment, and timekeeping practices. (R. Kingcade Dep. 36:23-8.) To illustrate the differences:

| Plaintiff | C/E/B[6] | Overtime | Other Employment | Supplies[7] | Timekeeping[8] | Taxes[9] |
|-----------|----------|----------|------------------|-------------|----------------|----------|
| Vecchio | B | Yes | Yes | No | Yes | Yes |

---

[6] C refers to "Contractor," E refers to "Employee," and B refers to both a contractor and employee.

[7] "Supplies" refers to whether or not the individual purchased his or her own supplies and materials, such as a centrifuge, stethoscope, scale, etc. (excluding printer-related materials).

[8] "Timekeeping" refers to whether or not the individual recorded his or her time while working for ExamOne.

[9] "Taxes" refers to whether or not the individual deducted expenses on his or her taxes.

14

| Plaintiff | C/E/B[6] | Overtime | Other Employment | Supplies[7] | Timekeeping[8] | Taxes[9] |
|---|---|---|---|---|---|---|
| Fagan | B | No | Yes | Yes (uses same supplies for work with other companies) | No | Yes |
| Shelton | C | Yes | Yes (operated an LLC) | Yes | No | Yes |
| Truett | E | No | Yes | Some | Yes | No |
| Hochstein | E | Once | Yes | No | Yes | No |
| L. Dunn | C | No | Yes (operated an LLC) | Yes (uses same supplies for work with other companies) | No | Yes |
| Walton | B | Yes | Yes | No | Yes | Yes |

(Vecchio Dep. 16:24-17:4, 18:12-14, 24:7-14, 25:4-11, 30:8-18, 37:24-38:2, 117:6-118:17, 123:7-20, 161:16-19; Fagan Dep. 9:2-12, 10:9-20, 14:10-15:13, 31:21-33:16, 42:11-43:22, 48:18-49:1; Shelton Dep. 13:12-14, 30:20-23, 44:18-20, 45:9-14, 103:13-16, 104:19-24, 107:16-23, 111:18-112:10; Ex. 69, Deposition of Candace Truett ("Truett Dep."), 12:17-19, 47:3-8, 48:9-11, 49:18-50:7, 52:24-53:5, 56:6-57:15; Ex. 39, Deposition of Leanne Hochstein ("L. Hochstein Dep."), 11:17-19, 34:24-35:8, 35:18-21, 36:8-11, 39:14-17, 38:9-12; L. Dunn Dep. 4:19-21, 5:11-16, 9:19-10:1, 37:1-38:1, 42:1-15; Ex. 71, Deposition of Lisa Walton ("L. Walton Dep."), 9:3-16, 16:24-17:11, 48:21-49:16, 51:7-9; 53:3-17, 57:5-60:17.)

   Plaintiffs who are independent contractors must necessarily show they were misclassified, and that inquiry is not resolved with common proof. *See Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 700 (S.D.N.Y. 2005) (overtime provisions of the FLSA "apply only to individuals who are 'employees'"); *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 536 (S.D.N.Y. 2014) (independent contractor analysis under the FLSA is "necessarily fact-intensive"). In *Holick v. Cellular Sales of N.Y., LLC*, for example, the court decertified an FLSA collective action of

contractors where the record showed the initial inquiry concerning an employer-employee relationship was "highly personalized" and not amenable to common proof. No. 12-584, 2019 U.S. Dist. LEXIS 70399, *2, *13 (N.D.N.Y. Apr. 26, 2019). There, the majority of opt-in plaintiffs had entered into independent sales agreements with the defendant. *Id*. at *2-3. Analyzing a central element for consideration – the defendant's degree of control over the individual – the court found significant diversity on the following important factors: the opt-in plaintiffs' classification and treatment of their own companies for tax purposes, investment in equipment, supplies and advertising, the hiring of other workers to support their engagement, their work for other companies, negotiations over prices, and their ability to determine and control their schedules. *Id*. at *13-17. Determining whether plaintiffs were employees or contractors required "an intensive review of their relationship" that presented highly individualized issues; such factual disparities led to decertification. *Id*. at *20; *see also Hernandez v. Fresh Diet, Inc*., No. 12-4339, 2014 U.S. Dist. LEXIS 139069, *12 (S.D.N.Y. Sept. 29, 2014) (determining legitimacy of classification was not possible on a collective action basis because it was not susceptible to common proof).

### C.  *Varying Testimony Among The Plaintiffs Demonstrates Individualized Situations.*

Vecchio and the Opt-In Plaintiffs do not share common experiences. It is not enough to "share an employer, a job title, and a professed entitlement to additional wages." *Ruiz*, 93 F. Supp. 3d at 300. The Opt-In Plaintiffs in the instant case must "in fact" be "similarly situated." *Myers*, 624 F.3d at 555. They are not. A variety of factors and Plaintiffs' personal choices unrelated to a company policy affect the hours Examiners work, and their deposition testimony demonstrates the dissimilarities. Plaintiffs' disparate factual settings require decertification.

### 1.  Plaintiffs Are Not Similarly Situated With Respect to Travel Time.

Plaintiffs allege their hourly compensation fell below federal minimum wage when they traveled to and from appointments. (ECF No. 1, ¶¶ 1, 70.) A superficial comparison of a duty—

travel to or from appointments—cannot establish the requisite connection. Opt-In Plaintiffs' testimony shows vast differences regarding average travel time, with such time ranging from 12.5 minutes to 97.5 minutes. (Rooney Dec. ¶¶ 80-81, Tables 1-2.)

For example, Opt-In Plaintiff, Savanna Thomas, for example, testified that, on average, it took her 10 to 15 minutes to travel between appointments. (Ex. 68, Deposition of Savanna Thomas ("S. Thomas Dep."), 25:16-21.) By contrast, Opt-In Plaintiff Jackie Ramirez testified her travel could last anywhere from 15 minutes to three hours. (J. Ramirez Dep. 24:4-14.) Vecchio claimed it took her up to 90 minutes to travel for her job, though "sometimes it was 10 minutes." (Ex. 16, Deposition of Maria Vecchio ("M. Vecchio Dep."), 55:6-10, 60:18-61:14.)

Not only was travel time unique to each Plaintiff, but it also differed depending on the Plaintiff's designated area, exam location, and the day and the time of travel. For example, Opt-In Plaintiff Brenda Martin testified that her travel varied from 10 to 45 minutes depending on the location of the exam, whereas Opt-In Plaintiff Reshondra Parks' travel time averaged 20 minutes on weekends, but "[w]eekdays it was always 30 to 45 minutes, because [she was] in traffic." (B. Martin Dep. 25:10-14; R. Parks Dep. 31:7-13.) Plaintiffs' varying testimony regarding travel time confirms the analysis is highly individualized and not suitable for collective treatment.

### 2. Plaintiffs Are Not Similarly Situated With Respect To Time Spent on Pre-Exam Work.

As Examiners, Plaintiffs were responsible for completing certain pre-exam duties. Such duties included calling clients in advance of the exam, preparing lab kits, and printing paperwork. (R. Kingcade Dep. 58:1-20, 63:1-8, 74:1-4, 83:2-6.) Evidence elicited during pre-trial discovery demonstrates that the amount of time spent on pre-exam work varies greatly from Examiner to Examiner, underscoring the fact that Plaintiffs are *not* similarly situated.

Some Examiners spent as little as five minutes completing pre-exam work for one exam,

some spent 10 to 15 minutes, some spent 30 to 45 minutes, and others took 82.5 minutes. (*Cf.* R. Contreras Dep. 33:22-24; E. Shelton Dep. 65:23-25; L. Walton Dep. 24:8-12; Ex. 56, Deposition of Kenneth Pomerantz ("K. Pomerantz Dep."), 42:16-43:8; C. Pope Dep. 18:15-19:5; Ex. 49, Deposition of Sallie Laurel ("S. Laurel Dep."), 17:21-23.) Vecchio could prepare for one exam in 15 minutes. (M. Vecchio Dep. 53:2-6.) When asked the same question, however, Opt-In Plaintiff Christine Gee testified that her pre-exam work (for one exam) would take between one and a half (1 ½) and two hours; in other words, depending on the exam, Vecchio could complete pre-exam work for up to ***eight exams*** in the same amount it time Gee could complete the work for ***one exam***. (*Compare* M. Vecchio Dep. 53:2-6 *with* C. Gee Dep. 22:18-23:1.)

Differences are also evident where Opt-In Plaintiffs provided a range to estimate the time spent on pre-exam work. For example, Opt-In Plaintiff Crystal Broady testified it would take her a total of 15 to 30 minutes to complete pre-exam work for four to six exams. (C. Brody Dep. 23:7-13.) Yet Opt-In Plaintiff Mary Hough testified it would take her one to one and a half (1 ½) hours for the same number of exams. (Ex. 41, Deposition of Mary Hough ("M. Hough Dep."), 31:22-32:19.) Opt-In Plaintiff Carolyn Griggs needed even more time, testifying she would take three to four hours to complete pre-exam work for four to six exams. (Ex. 37, Deposition of Carolyn Griggs ("C. Griggs"), 25:2-26:4.) Other Opt-In Plaintiffs could only provide a bulk estimate for all of the exams performed in a day, rather than a concrete number for *one* exam, making it exceedingly difficult to compare estimates. (Ex. 17, Deposition of Tiffany Anderson ("T. Anderson Dep."), 16:7-17:16 (five minutes to three hours to complete pre-exam work); N. Fagan Dep. 23:8-25:12 (requiring only ten to fifteen minutes per day).) Others could provide no estimate at all. (*See, e.g.*, Ex. 19, Deposition of Sharen Branham ("S. Branham Dep."), 35:19-22 ("Q. Could you give me an estimated range of time you would spend? A. No, I can't, because it was – it was different."); L.

Dunn 17:7-16 (could only provide an estimate for time spent on pre-exam work for all of the companies for which she worked).

The only consistent thread is the Opt-In Plaintiffs' acknowledgment that the time spent on pre-exam work "depends" on multiple factors. (H. Pitzer Dep. 18:18-24; 19:20-21 ("It just depends. I mean, sometimes it was like super quick and easy."); 19:11-12 ("You just never know what kind of situation you're going to walk into.").) The substantial variation in Plaintiffs' own time estimates (or their inability to provide estimates) shows Plaintiffs are not similarly situated, and there is no common basis to determine whether Plaintiffs worked for less than minimum wage or without overtime pay. *See Zivali*, 784 F. Supp. 2d at 466 (granting decertification because although plaintiffs claimed they were not compensated for pre-time punch and post-time punch work, some plaintiffs testified that their pre-punch work required *de minimus* time, while others obtained time adjustments if such activities took longer than usual); *Reed v. County of Orange*, 266 F.R.D. 446, 455-56 (C.D. Cal. 2010) (decertifying class where the standard deviation for pre- and post- shift activities was more than 20 minutes, showing "the data varied widely" and the wide variations in work time made the action unsuitable for collective treatment).

### 3.   Plaintiffs Are Not Similarly Situated With Respect To Time Performing Medical Exams.

The mobile exams range from simply taking physical measurements and preparing paper work to taking comprehensive paramedical histories with blood draws, urine specimen collections, and electrocardiograms. (Protocols Manual pp. 7-8.) The nature of the exam and patient dictates the length of the exam. (M. Vecchio Dep. 72:6-10 ("It depends on the service that is being provided."); A. Harris Dep. 35:16-36:11 ("Q. What causes the length of time you'd spend on a mobile exam to vary? A. The type of exam it is itself…Or it could be a patient not having to go to the restroom."); H. Pitzer Dep. 23:21-24:3 (testifying about length of paramed exam, "[a]gain

everything depends on the patient. It had nothing to do with us on how long it took").) A simpler exam, such as physical measurements, may take five to ten minutes; a more complicated exam, such as a comprehensive overview of an older patient's physical and mental capabilities, may take up to an hour. (Protocols Manual pp. 7-8.)

ExamOne provides time estimates for various tests. (P. Walker Dep. 12:14-14:10.) For example, it estimates a urine collection requires five minutes and a blood draw requires approximately 15 minutes. (Protocols Manual p. 8.) The time estimate for a paramedical exam ("paramed") is approximately 15-30 minutes; an older age supplemental takes 15-20 minutes. (*Id.* at pp. 7-8.) Plaintiffs' testimony, however, demonstrates these time estimates are not always accurate, as expected given the distinctions in an Examiner's skillset and a patient's personality. Many Plaintiffs' estimates were either higher or lower than ExamOne's. (*See, e.g.*, R. Parks Dep. 38:4-6 (disagreeing with approximate length of time for paramed exam); M. Dickinson Dep. 23:8-19 (blood draw takes her less time than ExamOne's estimate).)

Indeed, when asked to estimate the time it took to complete each of the different types of exams, Plaintiffs' answers run the gamut. To illustrate, crediting Plaintiffs' testimony as true, it could take anywhere from 50 minutes to six hours to perform one paramed exam from start to finish:

| Plaintiff | Log Time | Pre-Exam[10] | Travel | Paramed | Post-Exam | Total |
|---|---|---|---|---|---|---|
| C. Pope | Yes | 5-10 | 10-30 | 20-45 | 15-30 | 50-115 |
| D. Robertson | No | 30-40 | 35-60 | 35 | 120 | 220-225 |
| E. Ellis | No | 60 | 30 | 15-30 | 120-240 | 226-360 |
| L. Hughes | Yes | 15-60 | 6-50 | 60 | 60 | 141-230 |
| S. Johnson | Yes | 20 | 20-90 | 30-90 | 20-30 | 90-230 |

---

[10] Time estimates are in minutes.

(C. Pope Dep. 17:5-18, 18:15-19:5, 20:16-21:7, 26:24-28:2, 39:13-40:15; Robertson Dep. 19:19-23, 23:7-24, 25:13-26:7, 34:12-18, 39:13-40:14; E. Ellis Dep. 16:11-13, 17:20-21, 31:13-20, 35:22-36:1, 37:8-10, 38:10-17, 39:12-18; L. Hughes Dep. 21:23, 62:6-21, 36:24-37:9, 38:1-12, 41:10-12, 45:6-21, 49:10-14, 50:10-15; S. Johnson Dep. 25:18-26:15, 31:7-32:3, 38:3-7, 40:6-9, 45:7-15.)

Further, the Vecchio and the Opt-In Plaintiffs provided average estimates for paramed exams ranging from 15 minutes to two hours. (T. Skelton Dep. 27:9-11 (15 minutes); L. Hochstein Dep. 21:4-6 (two hours); L. Dunn Dep. 49:9-24 (30 to 45 minutes); M. Vecchio Dep. 74:10-75:18 (15 to 30 minutes); Ex. 25, Deposition of Pamela Corpuz ("P. Corpuz Dep."), 22:16-23:11 (45 to 90 minutes).) By contrast, Latrilla Cassey testified she "seldom" had exams last more than an hour. (Ex. 21, Deposition of Latrilla Cassey ("L. Cassey Dep."), 28:6-8; *cf.* R. Parks 38:7-8 (estimating "an hour, a little bit over an hour" for paramed exam).)

Plaintiffs' testimony also reveals a wide spread for other exams:

- *Physical Measurements*: Opt-In Plaintiff Christina Garcia Soto testified it only takes her five to ten minutes to complete physical measurements, but Opt-In Plaintiff Joel Validum's physical measurements last 30 to 40 minutes, while Opt-In Plaintiff Veronica Morrison only needed 20 minutes. (*Cf.* Ex. 66, Deposition of Christina Garcia Soto ("C. Garcia Soto Dep.") 32:9-15; Ex. 70, Deposition of Joel Validum ("J. Validum Dep."), 49:10-50:1; V. Morrison Dep. 21:19-22:5.)
- *Blood Draw*: Opt-In Plaintiffs described needing anywhere from two minutes (Maureen Dickinson) to 45 minutes (Brian Spadaro). (M. Dickinson Dep. 23:8-19, Ex. 67, Deposition of Brian Spadaro ("B. Spadaro Dep."), 37:24-38:3; *cf.* Ex. 44, Deposition of Kristin Johnson ("K. Johnson Dep."), 26:7-13 (15 minutes).)
- *Older Age Supplement*: Opt-In Plaintiffs described an older age supplement taking 15 to 20 minutes (Brittany Wood), to 60 minutes (Janet Wehrli), to between 95 and 105 minutes (Reshondra Parks). (Ex. 74, Deposition of Brittany Wood ("B. Wood Dep."), 41:8-13; Ex. 72, Deposition of Janet Wehrli ("J. Wehrli Dep."), 35:21-36:11, R. Parks Dep. 41:5-42:12.)

Each Plaintiff's testimony shows the time spent performing exams varied by type of exam, the particular exam, the patient, and the Examiner. Plaintiffs are not similarly situated.

4.      **Plaintiffs Are Not Similarly Situated With Respect To Post-Exam Work Time.**

After Examiners complete mobile exams, they finalize exam orders by scanning and uploading paperwork, spinning blood, and packaging specimens for shipment. (Kingcade Dep. 60:18-61:62:2.) Vecchio alleges this post-exam work takes approximately an hour to complete. (ECF No. 1, ¶¶ 72-75.) Yet, the Opt-In Plaintiffs' testimony shows significant variation.

For some, post-exam work for a single exam can take several hours, for others it takes a matter of minutes, and for others it was impossible to estimate. Indeed, some Opt-In Plaintiffs take eight times longer to perform the same post-exam work for one exam:

- <u>Named Plaintiff Maria Vecchio</u>: 15 to 30 minutes. (M. Vecchio Dep. 69:8-13.)
- <u>Opt-In Plaintiff Eulanda Ellis</u>: two to four hours. (E. Ellis Dep. 35:22-36:1.)
- <u>Opt-In Plaintiff Sandra Davis</u>: 20 to 30 minutes. (Ex. 27, Deposition of Sandra Davis ("S. Davis Dep."), 22:7-14.)
- <u>Opt-In Plaintiff Holly Pitzer</u>: anywhere from "an hour up to three to four hours." (H. Pitzer Dep. 30:24-31:8.)
- <u>Opt-In Plaintiff Ellora Jane Shelton</u>: anywhere from one to eight hours. (E. Shelton Dep. 78:4-17.)
- <u>Opt-In Plaintiff Brian Spadaro</u>: between two and six hours. (B. Spadaro Dep. 50:21-51:7.)
- <u>Opt-In Plaintiff Thelma Pichon</u>: between an hour and three and a half hours. (Ex. 54, Deposition of Thelma Pichon ("T. Pichon Dep."), 27:22-28:4.)
- <u>Opt-In Plaintiff Rut Contreras</u>: 25 minutes. (R. Contreras Dep. 35:15-36:6.)
- <u>Opt-In Plaintiff Lisa Dunn</u>: unable to differentiate time on post-exam work for ExamOne and other companies, but testified it could take two and a half to four hours for *all* companies, not only for ExamOne. (L. Dunn Dep. 17:7-16.)

Because Plaintiffs are not similarly situated in the time spent on post-exam work, they cannot move forward as one collective.

5.      **Plaintiffs Are Not Similarly Situated With Respect To Their Timekeeping Practices.**

As explained above, ExamOne requires its employees to clock in and out *any time* they perform work for ExamOne. (Kingcade Dep. 90:14-91:9.) ExamOne relies on its Examiners' timekeeping to ensure it can properly provide true-up payments and to pay for any overtime.

Plaintiffs' varying timekeeping practices would require ExamOne to separately analyze each individual Plaintiff's circumstances to determine whether a true up is necessary or whether an individual worked overtime; the determination cannot be made in one brushstroke.

Some Plaintiffs did not use Teletime at all, others always recorded their time, and others did so haphazardly. (*See* S. Thomas Dep. 44:13-20 (testifying she never heard of or used Teletime); S. Branham Dep. 32:3-11 (used timekeeping system for last couple years of employment, but often forgot to punch in and out); K. Pomerantz Dep. 36:3-7 ("Q. Did you record your time through the telephone system throughout your employment with ExamOne? A. You had to."); Ex. 23, Deposition of Terry Clyde ("T. Clyde Dep."), 28:7-24 (not aware of Teletime and could not remember using timekeeping system); C. Pope Dep. 35:2-12 (testifying she clocked in and out for several years using same timekeeping system); F. Kanu Dep. 32:5-12 (used Teletime since 2013, but practices changed over time because she saw no point when paid for services); P. Corpuz Dep. 36:1-12 (testifying, "not really, no" when asked if she tracked her hours).) Some Opt-In Plaintiffs clocked in the moment they left their homes, while others clocked in only when they arrived to the first appointment. (*See, e.g.,* F. Kanu Dep. 35:17-20 (clocked in for mobile exam at applicant's house); C. Gee Dep. 56:20-22 ("Q. When do you typically clock in at the beginning of your workday? A. When I leave my home."); Ex. 26, Deposition of Donita Craig ("D. Craig Dep."), 36:23-37:12 (testifying, "[i]t all depends" when she would clock in, but she recorded hours for pre-exam work).) Other Opt-In Plaintiffs could only speculate regarding their timekeeping practices. (*See, e.g.*, T. Pichon Dep. 17:4-16 ("I don't remember specifically…I don't remember if you clocked out – clocked in when you got there or if you clocked in on your way there."); L. Walton Dep. 78:11-16 (estimating the time she worked but failed to record would be "hard to do"; "it just varies on your workload every day"); E. Ellis Dep. 19:21-24 ("I didn't have any hours to

calculate, so I wouldn't even know the fluctuation. I just knew that I spent more time doing one examination in one day than the next").)

Regarding clock-out practices, some Plaintiffs did so when they left the last exam, and others clocked out when they arrived home at the end of the day. (*See* T. Hollins Dep. 75:11-19; A. Schaefer Dep. 38:16-39:2; K. Pomerantz Dep. 37:11-13.) Certain Plaintiffs testified they would not clock out until they finished post-exam work. (*See* M. Vecchio Dep. 33:7-12 (testifying she was always clocked in while performing post-exam work); S. Johnson Dep. 25:3-9 (testifying she would "clock out when [she was] completed with all the work that [she had] done for ExamOne and [had] everything faxed and packed."); C. Kappenhagen Dep. 90:8-91:25 (describing she punched in for pre-exam work, exams, travel between exams, and post-exam work).) These stark contrasts in timekeeping practices further show it is inappropriate to continue on a collective basis.

### 6.  Plaintiffs Are Not Similarly Situated With Respect To Working Overtime.

Individual inquiries are necessary to determine whether Plaintiffs even worked sufficient hours to trigger a potential overtime claim. Plaintiffs previously based certification of their overtime claim on the false premise that they all frequently worked more than 40 hours in a single week. The evidence elicited during discovery paints a far different picture, with more than half testifying they did not work overtime at all. Specifically, 32 of 58 Opt-In Plaintiffs testified they never worked more than 40 hours in a workweek or they could not recall ever doing so. For example, Opt-In Plaintiff Delanda Robinson testified she was "never" scheduled to work more than 40 hours per week. (D. Robinson Dep. 46:10-17; *see also* Ex. 73, Deposition of Kendra Whiteside Fantroy ("K. Fantroy Dep."), 30:2-4 (answering "no" when asked if ever worked more than 40 hours); B. Wood Dep. 47:25-48:11 (estimating she worked 25 to 40 hours a week, including "pre-exam prep, the exams, and the post"); H. Pitzer Dep. 44:25-45:5, 55:10-13 ("Q. Were you ever scheduled to work more than 40 hours a week? A. Oh, I didn't allow that…Q.

24

While you worked at ExamOne, did you ever record and submit time sheets with more than 40 hours in a workweek? A. No."); C. Truett Dep. 19:13-20:10 (only worked Fridays, Saturdays, and Sundays)). Opt-In Plaintiff Reshondra Parks could not recall ever working more than 40 hours per week. (*See* R. Parks Dep. 70:6-8.) Opt-In Plaintiff Felisa Knowles could not "give an accurate number [of her hours]." (Ex. 47, Deposition of Felisa Knowles ("F. Knowles Dep."), 34:14-20.)

Other Opt-In Plaintiffs' testimony concerning overtime is not credible, and there is no common proof upon which to determine whether any are entitled to overtime. For example, a former Contractor, Opt-In Plaintiff Joel Validum, testified he averaged 15 hours per mobile exam and was typically scheduled for 10 to 12 exams per day, resulting in the implausible estimate he could have worked more than 150 hours per day. (J. Validum Dep. 28:8-16; 128:6-129:21.)

Any claim for unpaid overtime necessarily involves an inquiry into the facts beyond Teletime, and that inquiry inevitably turns on individual stories regarding work hours, which differ drastically among Plaintiffs. Such differences make collective action treatment inappropriate. Further, because these individuals have no memory or evidence of working more than 40 hours in a workweek, they cannot pursue claims for unpaid overtime under the FLSA. *See Gomez*, 2017 U.S. Dist. LEXIS 123085 at *12 (granting decertification in part because "Plaintiffs' contention that they were denied overtime is not a problem common to the entire class. Several Opt-In Plaintiffs admit to rarely working overtime.").

### III.   **Defendants Have Individualized Defenses for Each Plaintiff and Claim.**

Plaintiffs' diverse experiences at ExamOne result in individualized defenses and "counsel[] in favor of decertification." *Thind*, 2016 U.S. Dist. LEXIS 170503, at *8; *see also Zivali*, 784 F. Supp. 2d at 464 ("in the context of varied factual and employment settings," defenses would be "highly individual to each plaintiff"). Where, as here, "the evidence suggests a wide disparity in

the relevant factual circumstances," Defendants "cannot be expected to come up with representative proof when the plaintiffs cannot reasonably be said to be representative of each other." *Holick*, 2019 U.S. Dist. LEXIS 70399, at *23-24 (internal citations omitted).

### A. *ExamOne Has Individualized Defenses To Plaintiffs' Employment Status.*

It is undisputed that Plaintiffs are a mix of employees and independent contractors. This fact compels decertification because it results in disparate factual and employment settings (*see* Section II, *supra*) and individualized defenses. *See Holick*, 2019 U.S. Dist. LEXIS 70399, at *24 (granting decertification due to "the highly fact intensive analysis to determine whether Plaintiffs were employees or independent contractors in the first place"). ExamOne is entitled to confirm each Plaintiff's employment status and thereby assert individual defenses based on that status. This cannot be accomplished on a collective basis.

### B. *ExamOne Has Individualized Defenses To Plaintiffs' Overtime Claims.*

The facts show that it was ExamOne's policy to pay overtime. (Kingcade Dep. 112:7-9.) But to receive overtime pay, a plaintiff must first work more than 40 hours a week. *See Barry v. Town of Elma*, No. 02-344, 2005 U.S. Dist. LEXIS 5548, *5-6 (E.D.N.Y. Mar. 25 2005) ("In an action to recover unpaid overtime wages under the FLSA, a plaintiff must show that: (1) he was an employee who was eligible for overtime…and (2) he ***actually*** worked overtime hours for which he was not compensated." (emphasis added)). More than half of the Opt-In Plaintiffs did not work overtime hours; indeed, 32 Opt-In Plaintiffs testified that they ***never*** worked more than 40 hours in a workweek or could not recall ever working more than 40 hours in a workweek. (*See* Defendants' Partial Motion for Summary Judgment, filed contemporaneously herewith.) For the other Opt-In Plaintiffs – and Vecchio – who testified they did work overtime, resolving their overtime claims necessarily requires an individualized assessment of (1) whether they did in fact work overtime; (2) the amount of overtime worked; (3) whether they were paid for overtime

26

worked; and (4) whether ExamOne had knowledge of any overtime hours performed. Defendants'
defense that Plaintiffs are not entitled to overtime pay is a highly individualized analysis, not just
to Vecchio, but to each Opt-In Plaintiff's actual instance of unpaid overtime.

Moreover, Plaintiffs must demonstrate that ExamOne had actual or constructive
knowledge of the alleged overtime work performed. *DeSilva*, 27 F. Spp. 3d at 325; *see
also Kuebel*, 643 F.3d at 361 ("To establish liability under the FLSA on a claim for unpaid
overtime, a plaintiff must prove that he performed work for which he was not properly
compensated, and that the employer had *actual or constructive knowledge of that work*." (emphasis
added).) This analysis undoubtedly requires a careful analysis of each Plaintiff's circumstances.

### C. *ExamOne Has Individualized Defenses To Plaintiffs' Minimum Wage Claims.*

The same holds true for Plaintiffs' minimum wage claims. It is undisputed that ExamOne
compensated Plaintiffs on a fee-for-service basis for mobile exams. (*See* R. Kingcade Dep.
36:12-19; E. Snider Dep. 13:4-6; J. Validum Dep. 60:8-10; C. Seemer Dep. 10:17-19.) It is also
undisputed that Plaintiffs engaged in pre- and post-exam work in addition to conducting the
medical exams themselves. Thus, whether a particular plaintiff has a viable claim for unpaid
minimum wage depends on the time he or she spent on (1) pre-exam work; (2) the exam(s)
themselves; (3) post-exam work; and (4) travel between exams. As demonstrated above, Opt-In
Plaintiffs had widely varying answers bearing on these four categories. Further, even if the time
spent was consistent, *additional* assessment is necessary to determine whether a particular
plaintiff's compensation ever fell below federal minimum wage. This is because one of
Defendants' defenses is that it will "true up" an Examiner's pay with the difference between the
fee for a service and the minimum wage rate for the time an Examiner actually took to complete
that service. (ECF No. 22, Defense No. 20; R. Kingcade Dep. 101:12-23.) This in effect places the
employee at minimum wage. (Maletto Dec. ¶ 4.) In other words, each Opt-In Plaintiff who can

27

properly demonstrate that he or she fell below minimum wage must *also* demonstrate that he or she did not receive a true up. And ExamOne has provided more than 6,700 s and paid more than $416,000 in true-up payments since 2016. (*Id.* at ¶¶ 6-11.) One Plaintiff's calculation differs dramatically from the next, necessitating highly individualized analyses and thousands of mini-trials.

ExamOne has already established that its individualized defenses to Plaintiffs' minimum wage claim warrants dismissal. As more fully explained in Defendants' Partial Motion for Summary Judgment, Vecchio's own expert, Dr. Stephanie Plancich, concluded that Vecchio did not have a federal minimum wage claim. In both her original and supplemental expert reports, as well as her deposition, Dr. Plancich concluded that, having reviewed Vecchio's records, Vecchio's deposition testimony, and ExamOne's policies, Vecchio's hourly rate never fell below Federal minimum wage while she worked for ExamOne. (Ex. 76, Original Report of Dr. S. Plancich, p. 10, n. 15 ("Ms. Vecchio does not have Federal minimum wage violations."), pp. 15-16; Ex. 77, Supplemental Report of Dr. S. Plancich, p. 12 ("Maria Vecchio had no Federal minimum wage violations."); Ex. 78, Deposition of Dr. S. Plancich 130:9-131:5 ("I did not calculate any federal minimum wage violations."), 164:15-165:1 ("To the best of my recollection, there is no federal minimum wage violation for Ms. Vecchio."), 188:5-12 ("I don't find any minimum wage violations for Ms. Vecchio.").) ExamOne is entitled to assert its defenses against each of the other Opt-Plaintiffs; this cannot be accomplished in a collective action.

## IV.     <u>Fairness And Procedural Considerations Compel Decertification.</u>

Adjudicating these claims in one proceeding would be inefficient and manifestly unfair to ExamOne and the Opt-In Plaintiffs. Resolving this case will require highly individualized mini-trials for Vecchio and each Opt-In Plaintiff to determine whether and to what extent they were paid under the minimum wage, worked overtime, the knowledge of their supervisors, if any,

Defendants' individualized defenses, and damages, if any.

Fairness and procedural considerations dictate that the collective action be decertified. Because the Opt-In Plaintiffs' experiences are substantially different, "the procedural advantages of a collective action cannot be realized." *Stevens v. HMSHost Corp.*, No. 10-3571, 2014 U.S. Dist. LEXIS 119653, *21 (E.D.N.Y. Aug. 26, 2014). Proceeding collectively would "either prejudice defendants' ability to present their defenses or require mini-trials for each of the opt-in plaintiffs." *Desilva*, 27 F. Supp. 3d at 327; *see also Holick*, 2019 U.S. Dist. LEXIS 70399, at *26. It would be highly prejudicial to ExamOne for the fact-finder to consider Vecchio's testimony that she clocked in while doing post-exam work, took 15 minutes to complete pre-exam work for one exam, and took up to three hours to complete all of her post-exam work, while also considering, for example, Opt-In Plaintiff Sandra Davis' testimony that she clocked out when leaving her last appointment, took an hour to complete post-exam work, and completed post-exam work for one or two exams in only 20 to 30 minutes. The substantial factual variations between Vecchio and the Opt-In Plaintiffs make it impossible to generalize their claims. Thus, "considerations of procedure and fairness weigh heavily in favor of granting decertification." *Zivali*, 784 F. Supp. 2d at 459.

Here, each Opt-In Plaintiff tells a unique story about his or her work with ExamOne, which he or she claims resulted in improper payment. Indeed, the numerous distinctive factual determinations required for each Opt-In Plaintiff will necessitate the parties to not only call the Opt-In Plaintiffs to corroborate each claim, but a slew of other witnesses as well, such as managers, coworkers, clients, and experts who will analyze time records. The required mini-trials are antithetical to collective treatment. Moreover, there is no way, consistent with due process, to adjudicate the claims of Vecchio and the Opt-In Plaintiffs based on the sample Opt-In Plaintiffs. Whether any of the thousands of other Opt-Ins who were not subject to discovery would testify

similarly concerning travel time, time spent performing exams, and pre- and post-exam practices, or would instead provide completely different testimony, can only be determined by obtaining testimony and evidence from such Opt-Ins. Proceeding on a collective basis has only one possible result: unfairness to ExamOne and "manageability problems for the Court." *Desilva*, 27 F. Supp. 3d at 327. The disparate factual circumstances among the Opt-In Plaintiffs, the individualized defenses at issue, and procedural and fairness concerns weigh heavily against allowing this case to proceed as a collective action. In sum, decertification is the only proper course. *See Zivali*, 784 F. Supp. 2d at 459 ("[T]he Court harbors considerable doubt that any fair determination could be achieved on the basis of representative evidence.").

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant their Motion, decertify the collective action, and dismiss the claims of the Opt-In Plaintiffs without prejudice, pursuant to 29 U.S.C. § 216(b).

New York, New York
Dated: February 21, 2020.

Respectfully submitted,

*/s/ Arthur J. Rooney*
Arthur J. Rooney (admitted *pro hac vice*)
**BAKER & MCKENZIE, LLP**
300 E. Randolph St., Suite 5000
Chicago, Illinois 60601
+ 1 312 861 8000
+ 1 312 861 2899 (facsimile)
arthur.rooney@bakermckenzie.com

Robert P. Lewis (RL-6321)
**BAKER & MCKENZIE, LLP**
452 Fifth Avenue
New York, NY 10018
+ 1 212 626 4100
+ 1 212 310 1600 (facsimile)
robert.lewis@bakermckenzie.com
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2020, a copy of the foregoing *Memorandum of Law* was filed with the Clerk of Court and served on all counsel of record via the Court's electronic case filing (CM/ECF) system.

/s/ Arthur J. Rooney