UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIA VECCHIO, *individually and on behalf of all others similarly situated*,

      Plaintiff,

   – against –

QUEST DIAGNOSTICS INC., EXAMONE WORLD WIDE, INC., *and* EXAMONE LLC,

      Defendants.

---

**OPINION & ORDER**

16 Civ. 5165 (ER)

R AMOS, D.J.:

  Mobile medical examiner Maria Vecchio filed her lawsuit in June 2016, alleging that her employer, ExamOne, had failed to pay minimum and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207.  Since then, nearly 3000 other mobile examiners have joined her lawsuit as "opt-in plaintiffs."  After years of discovery, the defendants move to decertify this nation-wide class and for partial summary judgment of Vecchio's minimum wage claims and the overtime claims of 32 opt-in plaintiffs.

  After careful review of the extensive record presented to it, the Court GRANTS the defendants' motion to decertify and their motions for partial summary judgment.  The Court finds that Vecchio has failed to show the opt-in plaintiffs are similarly situated to her in any material respect.  The Court further finds that, after discovery, Vecchio's minimum wage claims and the overtime claims of 32 opt-in plaintiffs[1] must be dismissed as a matter of law.

---

[1] These plaintiffs are Tiffany Anderson, Crystal Broady, Macheall Christion-Amador, Terry Clyde, Rut Contreras, Donita Craig, Sandra Davis, Maureen Dickinson, Lisa Dunn, Michelle Dunn, Nancy Fagan, Kendra Whiteside Fantroy, Christine Gee, Edwin Gonzalez, Alexis Harris, Mary Hough, Felisa Knowles, JoAnn Kresko, Sallie Laurel, Brenda Martin, Veronica Morrison, Reshondra Parks, Thelma Pichon, Holly

## I.      BACKGROUND

ExamOne LLC, a wholly owned subsidiary of ExamOne World Wide, Inc. (in turn a wholly owned subsidiary of Quest Diagnostics Inc.), provides medical examinations of individuals applying for life insurance policies.  Rooney Decl. ex. 12 ("Kingcade Dep.") 31:15–18, Doc. 3177.  These exams can include, *inter alia*, physical measurements, blood draws, electrocardiograms, and taking medical histories.  Rooney Decl. ex. 1 ("Standards & Protocols Manual") at 7–8.

### A.  ExamOne's Contractors & Employees

ExamOne employs and contracts with mobile medical examiners to perform these procedures.  Kingcade Dep. 34:7–17.  The examiners typically travel to patients' homes or offices, although they also can perform examinations at health fairs sponsored by an employer or at an ExamOne office.  *See* Kingcade Dep. 33:16–34:6; Rooney Decl. ex. 10 ("Cessner Dep.") 11:14–21.  Examiners advise ExamOne when they are available during the week to conduct examinations, as well as what zip codes they are willing to serve.  Cessner Dep. 63:17–25.  In addition to performing the examination itself, examiners perform administrative work before and afterward, including contacting clients to confirm upcoming examinations, preparing and printing paperwork, and packaging and shipping specimens collected from the patient.  *Id.* 16:6–4.

Some of these mobile examiners are hired as independent contractors.  These contractors agree to perform examinations according to policies and standards set by ExamOne, *see generally* Standards & Protocols Manual, for which they were paid either a percentage of the revenue ExamOne earned from insurance providers or a set fee per procedure, Kingcade Dep. 36:23–37:8.  The rates and method of payment vary depending on negotiations between ExamOne and the individual contractor.  *Id.*  Independent contractors provide equipment such as stethoscopes, centrifuges, and butterfly needles

---

Pitzer, Carmella Pope, Marci Raso, Delanda Robertson, Bernadette Rodriguez, Ann Schaefer, Savanna Thomas, Candace Truett, and Brittany Wood.

(*i.e.*, needles used in blood draws where the patient's vein is difficult to find), while ExamOne provides a "test kit" for each examination.[2]  *See, e.g.*, Rooney Decl. ex. 6 ("Vecchio Independent Contractor Agreement") § 4; Rooney Decl. ex. 33 ("Fagan Dep.") 33:2–6.  Some contractors use the equipment they purchased in connection with conducting examinations for employers other than ExamOne.  Fagan Dep. 33:7–16.

Some contractors form an independent legal entity such as a limited liability company, which is the actual party in contract with ExamOne.  *See, e.g.*, Rooney Decl. ex. 29 ("Dunn Dep.") 4:19–21.  In fact, some of these entities employ several other individuals, to whom the independent contractor delegates his or her exams.  *See, e.g.*, Rooney Decl. ex. 75 ("Brosnan Decl.") ¶ 7.  Independent contractors can and do work for other insurance examination providers, with at least one contractor working for up to a dozen companies at one time.  Shelton Dep. 18:13–17.  Independent contractors do not record their time at all with ExamOne.  Cessner Dep. 11:4–6.

Other examiners are directly employed by ExamOne, almost always on a part-time basis.  Rooney Decl. ex. 14 ("Strohm Dep.") 10:8–13.  As a policy, ExamOne attempts to have examiners work fewer than 30 hours per week.  Kingcade Dep. 112:10–11.  At times, an examiner's manager could withdraw appointments remaining in the week should the examiner be on track to work more than 30 hours.  *See, e.g.*, *id.* 110:8–11; Badala Decl. ex. 13 ("Hughes Dep.") 63:9– 17.

Unlike independent contractors, employed examiners are provided equipment including scales, centrifuges, blood pressure cuffs, and butterfly needles, in addition to consumables in a test kit.  Rooney Decl. ex. 16 ("Vecchio Dep.") 118:1–5.  ExamOne does not provide or reimburse employees for printing supplies, including paper, ink, and the printer itself.  Rooney Decl. ex. 22 ("Christion-Amador Dep.") 27:21–28:2.

---

[2] The parties have not specified precisely what is in a test kit.

Employees are paid a set fee for each procedure performed during an examination.  Kingcade Dep. 36:17–22.  They additionally receive an hourly wage for time spent performing examinations at health fairs or in ExamOne's office, *id.* 55:20–25, and they can receive bonus compensation under certain circumstances, including when the patient does not show to the appointment.  Cessner Dep. 47:19–48:1.  Although examiners are occasionally compensated for atypically large amounts of travel, ExamOne does not reimburse examiners for normal mileage.  Kingcade Dep. 66:2–25.

### B.  Timekeeping

Even though employed examiners are paid on a fee-for-service model, they are required to track their time through a system called Teletime.  Kingcade Dep. 90:14–91:1.  Some examiners use paper timesheets instead.  *See, e.g.*, Rooney Decl. ex. 60 ("Robertson Dep.") 35:13–36:9.  ExamOne used the time records created through these systems to determine what mobile examiners may require an additional payment to reach minimum wage — if their examination fees divided by their hours worked was less than the statutory minimum — or overtime — if they worked more than 40 hours.  Maletto Decl. ¶ 4, Doc. 3176; Kingcade Dep. 112:7–14.

ExamOne's formal policies require that employed examiners keep track of their time and indicate they can face discipline if they do not properly enter their time.  According to one undated document laying out the performance expectations of examiners, "Examiners are required to clock in/out any time you are working for ExamOne.  Failure to clock in/out can result in disciplinary actions.  Repeat offenses may result in termination."  Rooney Decl. ex. 4 at QUEST 1027; *see also* Rooney Decl. ex. 9 at NS_Mary.Hough 465 (threatening "corrective action" if examiners do not properly record all time).  In at least one May 2016 email produced during discovery, a manager wrote to examiners directing them to record all time, including time for work done at home.  *See* Rooney Decl. ex. 8 ("[Y]ou will punch in and out anytime you are doing work for Exam One.  If you are completing exams you will punch in when you leave your

home and stay punched in until you complete your paperwork and centrifuging."); *see also* Rooney Decl. ex. 38 ("Harris Dep.") 110:18–111:14 (describing a similar email).

Several plaintiffs report, however, that they were directed to record only their time working away from home.  For example, Crystal Broady said, "They told me, when you leave your house, to clock in.  And then when you are getting home, you clock out." Badala Decl. ex. 5 ("Broady Dep.") 21:16–21.  Additionally, one Teletime training document indicated that examiners should clock in when leaving home and clock out upon their return:

- Record your time as soon as you begin travel to your first appointment because your home is your 'place of work'.
- If you will be returning home after your first appointment, punch out as soon as you arrive home.  If travel to your second appointment of the day starts/ends at home, punch in as you are leaving home and punch out when you return home.
- If you are going immediately from your first appointment to your second appointment of the day, remain punched in until all sequential appointments are completed.
- If you have a gap between appointments, you are free to use this time as you wish, therefore you should punch out when you complete your appointment and punch back in when you begin to travel to your next appointment.

Badala Decl. ex. 15 at QUEST 3.

Other examiners indicated that had been directed to limit their recording to the time spent performing examinations.  For example, Brittany Wood testified that she was told shortly after being hired she "needed to only be clocked in when [she] was actually doing exams."  Badala Decl. ex. 3 ("Wood Dep.") 33:21–25, Doc. 3191.  And Natasha Truett stated, "[T]hey didn't tell us to clock in [while performing post-examination work].  They just said when you're doing the exam."  Badala Decl. ex. 4 ("Truett Dep.") 57:17 22.

And some examiners suggested that their managers confronted them when they recorded time spent on tasks other than examinations.  Reshondra Parks indicated she

5

would get questions from her managers when she recorded post-examination work. Badala Decl. ex. 15 ("Parks Decl.") 80:7–14.  When she told them that an hour and fifteen minutes had passed between her last examination and when she clocked out because she was working on examination-related paperwork, those managers told her to clock out after she left the patient's house, instead.  *Id.*  And Vecchio herself points out that her manager once asked her to adjust her hours downward because the manager believed Vecchio had spent too much time on post-examination work.  Badala Decl. ex. 2 ("Opp. Dunbar Dep.") 106:8–11.

Employed examiners varied in their adherence to the official ExamOne timekeeping policy.  Some recorded all of their time, including pre- and post-examination work.  *See, e.g.*, Skelton Decl. ¶ 4, Doc. 444.  Others failed to record all of their time because it was "natural not to think about it" given the fee-for-service nature of their pay.  *See, e.g.*, Harris Dep. 99:14–101:7.  And others did not record their time at all, with one denying the use of timesheets or Teletime altogether.  *See, e.g.*, Rooney Decl. ex. 63 ("Seemer Dep.") 27:1–28:15.

### C. Estimating Time Worked

During discovery, the parties ultimately deposed 59 plaintiffs, including Vecchio.  In these depositions, the deponents made widely varying estimates of the time they traveled between appointments, the time they spent working on pre-appointment tasks, the time they spent during examinations, and the time they spent on post-examination tasks.  Travel time between appointments varied between 12 and 98 minutes per appointment, for example.  Rooney Decl. tbl. 2.  Pre-appointment work could vary between 15 and 120 minutes.  *Compare* Vecchio Dep. 53:2–6 *with* Rooney Decl. ex. 35 ("Gee Dep.") 22:18–23:1.  The time to complete an examination procedure varied, as well, among examiners.  For example, one examiner testified it took her 5 to 10 minutes to take physical measurements while another took between 30 and 40 minutes.  *Compare*

Rooney Decl. ex. 66 ("Soto Dep. 32:9–15") *with* Rooney Decl. ex. 70 ("Validum Dep.") 49:10–50:1.

To generalize the amount of time worked across the collective, Vecchio engaged an expert, Dr. Stephanie Plancich, who created a methodology she claims can "reliably identify minimum wage and overtime violations for class members."  Badala Decl. ex. 22 ("Plancich Rep.") ¶ 2.  Vecchio provided Plancich with, *inter alia*, ExamOne's pay schedule for the various procedures; ExamOne's estimates of time to prepare for, travel to, perform procedures, and process paperwork for procedures afterwards; records of procedures performed and wages paid for 13 examiners, including Vecchio; time records for 85 employees; and deposition transcripts of 12 examiners, including Vecchio.[3]  *Id.* ¶¶ 10–11, ex. B.

In creating her methodology, Plancich accepted ExamOne's estimates of the time it takes to perform medical procedures but did not rely on ExamOne's estimates of travel time or pre- and post-examination work.  Plancich Rep. ¶ 15(a).  To estimate travel time and time spent on pre- and post-examination tasks, Plancich reviewed the 12 depositions provided to her by Vecchio and calculated an average based on the testimony.  *Id.* ¶ 15(b), (c).  She concluded that, on average, an examiner would spend 29 minutes preparing for an appointment, 41 minutes on post-appointment work, and 25 minutes traveling between appointments.  *Id.* ¶ 19.  Plancich opined that any given plaintiff's minimum wage and overtime violations can then be calculated by using ExamOne's estimates of time conducted per procedure, her per-appointment estimates of travel time, pre-examination work, and post-examination work, and ExamOne's records of procedures conducted and wages paid.  *Id.* ¶¶ 22–25.

An expert engaged by ExamOne, Dr. Joseph A. Krock, characterizes Plancich's methodology as producing "incorrect, inaccurate, and unreliable estimates of minimum

---

[3] Vecchio provided Plancich with the wage records of Mary Hough, but did not provide her deposition transcript.

wage and overtime violations." Rooney Reply Decl. ex. 3 ("Krock Rep.") ¶ 9(8), Doc. 3200. Krock first opined that Plancich's calculation of average travel, pre-appointment, and post-appointment times was inaccurate because she did not cross-reference estimates described by deponents with other data provided to her, including appointment records. *Id.* ¶ 25. He further notes that time estimates could vary widely within a single deposition, and that Plancich did not account for the reasons behind that variation in her methodology, thereby reducing its usefulness. *Id.* ¶ 26. For example, one deponent stated she spent between 15 minutes and 2 hours per day on pre-appointment activities and between 2 and 4 hours per examination on post-appointment work. *Id.* ¶ 27 (citing Rooney Decl. ex. 31 ("Ellis Dep.") 34:3–17, 35:19–26:15. And he notes that time estimates vary widely as well among the different deponents. *Id.* ¶ 31. For example, one deponent estimated post-appointment time per examination at between 15 and 30 minutes, while another estimated between 120 and 140 minutes. *Id.* ¶ 30. Finally, Krock observed that Plancich's methodology sometimes resulted in improbable amounts of time worked per day, calculating that at least one deponent worked nearly 21 hours in a single day, with over 16 of those hours being spent on pre- and post-appointment work. *Id.* ¶ 33.

### D. Maria Vecchio

Maria Vecchio, the named plaintiff, began working for ExamOne as an independent contractor in November 2013, earning 38 percent of the amount ExamOne billed to insurance companies for each examination. Vecchio Independent Contractor Agreement § 2. She was hired as a part-time employee in June 2014, earning a set fee per examination performed and an overtime rate of $26.54 per hour. Rooney Decl. ex. 7 ("Employment Offer") at 1. During her time at ExamOne, Vecchio worked in New York City and primarily examined patients at their homes and offices until she left ExamOne in 2016. Defs.' Statement of Material Facts ("Defs.' SMF") ¶¶ 1, 3, Doc. 3181. Like other

employed mobile examiners, Vecchio received a pre-determined fee for each procedure she completed.  *Id.* ¶ 4.

Vecchio claims that she did not make minimum wage and was owed overtime for her work at ExamOne.  In her deposition, she stated that she was not paid "for at least three hours out of [her] day" and that she worked ten to twelve hours per day "95% of the time."  Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶ 12, Doc. 3188.  She further claims that her supervisor, Danielle Dunbar, directed her to record only the time she spent in an examination, and to not include any time spent traveling or working before or after an examination.  *Id.* ¶ 8.

Vecchio's expert, Plancich, used Vecchio as an "illustration" of her methodology for calculating collective-wide damages, characterizing the analysis as "preliminary."  Pl.'s SMF ¶¶ 2, 3.  Plancich ultimately concluded, "Ms. Vecchio does not have Federal minimum wage violations."  Defs.' SMF ¶¶ 9, 11.  The expert confirmed this finding in her two depositions.  *See* Defs.' SMF ¶¶ 10, 12.

### E.  Other Plaintiffs

The 32 opt-in plaintiffs against whom the defendants move for summary judgement each characterized the amount of time they worked for ExamOne in a typical week during their depositions:

- **Tiffany Anderson** — "I do not recall ever working over 40 hours as an ExamOne employee."  Ex. G[4] at 18:17–18.

- **Crystal Broady** — Q:  Was there ever a time that you worked more than 40 hours in a week . . . .  A:  No.  Ex. H at 27:19–21.

- **Macheall Christion-Amador —** "I have never worked over 40 hours in a week at ExamOne."  Ex. I at 8:18–19.

- **Terry Clyde** — Q:  While you worked for [ExamOne], did you ever work more than 40 hours per week?  A:  No.  Ex. J at 37:8–11.

---

[4] All exhibits referenced in this list are exhibits to the Rooney Declaration filed in support of the defendants' motion for summary judgement, Doc. 3182.

- **Rut Contreras** — Q:  Have you ever worked more than 40 hours in a week for ExamOne?  A:  No.  Ex. K at 53:2–4.

- **Donita Craig** — Q:  While you worked at [ExamOne] did you ever record a time sheet with more than 40 hours in a work week?  A:  No ma'am.  Ex. J at 42:4–6.

- **Sandra Davis** — Q:  At any time during your employment with ExamOne, did you ever work more than 40 hours a week?  A:  No.  Ex. M at 40:11–13.

- **Maureen Dickinson** — Q:  Were you ever scheduled to work more than 40 hours per week?  A:  No. . . .  Q:  While you worked at ExamOne, did you ever record and submit time sheets with more than 40 hours?  A:  No.  Ex. N at 38:4–6, 43:21–24.

- **Michelle Dunn** — Q:  Did you ever work more than 40 hours for [ExamOne]?  A:  No.  Ex. O at 63:1–3.

- **Nancy Fagan** — Q:  Did you ever work more than 40 hours in a week for [ExamOne]?  A:  It could be.  Q:  Do you know if you did?  A:  . . . I would say 40.  No more than 40.  Ex. P at 48:18–49:1.

- **Kendra Whiteside Fantroy** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  No.  Ex. Q at 30:2–4.

- **Christine Gee** — Q:  [H]as there ever been a week that you recall since 2015 that you worked more than 40 hours in a week?  . . .  A:  No.  Ex. R at 61:7–13.

- **Alexis Harris** — Q:  Have you ever worked more than 40 hours in a week for ExamOne?  A:  No. . . .  Ex. S at 64:13–19.

- **Mary Hough** — Q:  Was there ever a time that you worked more than 40 hours in a week for ExamOne?  A:  I don't think so.  Ex. T at 52:11–13.

- **Felisa Knowles —** Q:  Did you ever work more than 40 hours per week for ExamOne or Quest?  A:  I don't believe so.  Ex. U at 35:1–3.

- **JoAnn Kresko** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  No.  Ex. V at 44:6–11.

- **Sallie Laurel** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  Probably not.  Ex. W at 45:15–17.

- **Brenda Martin** — Q:  Let's say time spent driving and at applicants' homes, did you ever perform more than 40 hours a week?  A:  I imagine I did.  No.  Wait a minute.  No.  I could not have done that.  I could not have because I had my other job.  So the answer would be no.  Q:  Counting [pre-exam work, post-exam work, and time at applicants' homes], did you ever work more than 40 hours a week for ExamOne?  A:  Okay.  Based on the times that I've given you, I would say that I did not. . . .  Ex. X at 54:1–14.

- **Veronica Morrison** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  No.  Ex. Y at 41:1–3.

- **Reshondra Parks** — Q:  Did you recall ever working more than 40 hours in a week for ExamOne?  A:  No.  Ex. Z at 87:21–88:1.

- **Carmella Pope** — Q:  Have you ever worked more than 40 hours in a week for ExamOne?  A:  No.  Ex. AA at 54:16–17.

- **Marci Raso** — Q:  In a given week have you ever worked more than 40 hours for ExamOne?  A:  I am going to say no.  Not 40 hours, no.  Ex. BB at 57:7–10.

- **Delanda Robertson** — Q:  While you worked for [ExamOne], did you ever actually work more than 40 hours per week?  A:  Never.  Ex. CC at 46:10–17

- **Bernadette Rodriguez** — Q:  Did you ever work more than 40 hours in a week?  A:  No.  Ex. DD at 31:23–32:1.

- **Ann Schaefer** — Q:  While you worked for ExamOne, did you ever work more than 40 hours in one week?  A:  I did not, no.  Ex. EE at 43:9–11.

- **Candace Truett** — Q:  Did you ever work more than 40 hours per week?  A:  No.  Ex. FF at 53:3–5.

- **Brittany Wood** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  No, I think that would be my — the most that I would work in a week.  Ex. GG at 47:14–17.

- **Holly Pitzer** — Q:  Did you ever work more than 40 hours a week?  A:  I don't think so.  I might have.  I don't honestly recall.  I didn't — I didn't try to make this job to be a full-time job when it came to the hours if that makes sense.  Ex. HH at 45:3–8.

- **Lisa Dunn** — Q:  Have you ever been scheduled to work more than 40 hours a week for [ExamOne]?  A:  I mean, I make my own schedule, so, I mean, I — typically between beginning to end for the whole week, I work anywhere from 60 to 80 hours a week.  Q:  Would that be for [ExamOne] specifically or — A:  All of them.  It's hard to break up, you know, one company or another, you know.  Ex. II at 37:1–10.

- **Thelma Pichon** — Q:  Do you recall approximately how many hours a week you would perform services for ExamOne while you were in Alaska?  A:  In the beginning probably — as an independent contractor it was more probably more like 20 to 25 hours a week.  And then once we became employees, I feel like my time went up.  I want to say there were times I hit 35, 40 maybe.  [Forty] was rare, but at least 30 to 35 hours a week.  And then I didn't have to work all those jobs either towards the end.  I wasn't working all those jobs.  I was only working ExamOne. . . .  Q. While you worked for ExamOne in Austin do you recall approximately how many hours a week you would work for ExamOne?  A. Probably about 20 to 25.  I think every once in a while I hit 30.  Very rare, though.  Ex. JJ at 20:22–21:5, 23:1–5.

- **Edwin Gonzalez** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  I don't recall.  Ex. KK at 34:9–11.

- **Savanna Thomas** — Q:  Did you ever work more than 40 hours in a week for ExamOne?  A:  I couldn't recall.  Ex. LL at 45:14–16.

## II.    PROCEDURAL HISTORY

Vecchio filed her complaint in June 2016.  Doc. 1.  In that complaint, she alleged one count of failure to pay minimum wage in violation of 29 U.S.C. § 206 and one count of failure to pay overtime in violation of 29 U.S.C. § 207.  She alleged that she was owed these wages for the entirety of her association with ExamOne, including the time during which she was employed as an independent contractor.  She further alleged that the defendants failed to keep records with respect to her hours and that the defendants' conduct was willful for purposes of extending the statute of limitations.  In addition to these federal claims, Vecchio alleged minimum wage, overtime, and wage theft counts under sections 195 and 652 of the New York Labor Law.

After approximately a year of discovery, the parties stipulated to the dismissal without prejudice of the New York Labor Law claims in October 2017.  Doc. 477.  Vecchio eventually refiled those claims in state court, after which the defendants removed them to the Southern District; the case was assigned to this Court as related to the present matter.  *See Vecchio v. Quest Diagnostics, Inc.*, No. 19 Civ. 5194 (ER) (S.D.N.Y. filed June 3, 2019).

Six months after the state law claims were dismissed from this lawsuit, the Court conditionally certified an FLSA collective on April 30, 2018.  Doc. 644, 2018 WL 2021615.  In its Opinion and Order, the Court found that Vecchio had made a preliminary showing that the proposed members of the collective were similarly situated to her in that they were subject to a common policy that did not allow them "to remain clocked in while conducting pre- and post-appointment work."  2018 WL 2021615, at *6.  The Court authorized the issuance of a nationwide notice addressed to "All persons who were employed directly by Defendants as Mobile Examiners (or similar job position), whether designated as independent contractors or employees, at any time in the three

12

years prior to the filing of this Complaint." *Id.*, at *8.  By the end of the notice period, nearly 3000 plaintiffs had opted in to the collective.  Defs.' SMF ¶ 7.

Discovery proceeded under the guidance of Magistrate Judge Fox.  On September 5, 2019, Judge Fox set a deadline of October 26, 2019, for the end of fact discovery.  Doc. 3156.  He ultimately extended expert discovery to January 21, 2020.  Docs. 3158, 313165.  The defendants filed their motions for decertification and partial summary judgment on February 21, 2020.  Docs. 3174, 3179.

### III.   FLSA

The elements of FLSA minimum wage and overtime claims are straightforward.  *First*, the plaintiff must prove she was an employee of the defendant.  *Second*, she must prove she was engaged in or employed by an enterprise engaged in interstate commerce.  And, *third*, she must prove that the defendant failed to pay her the minimum wage or overtime as required by the FLSA.  *See* 28 U.S.C. §§ 206(a)(1), 207(a)(1); *see also, e.g.*, *Zhong v. August August Corp.*, 498 F. Supp. 2d 625 (S.D.N.Y. 2007).  Employers are not limited to paying their employees hourly.  Instead, they may choose to compensate their workers by the "piece" — or unit of product produced — if the employer and employee agree to that method of payment prior to the performance of the work.  28 U.S.C. § 207(g).

It is the employer's responsibility to keep accurate records of time worked.  28 U.S.C. § 211(c).  If the employer does not keep such records, then the plaintiff may prove her hours worked through her own estimations, which at summary judgment, amount to "sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference."  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  Furthermore, for hours to count towards overtime, the employer must have "actual or constructive knowledge" of the qualifying hours worked by the plaintiff.  *Id.* at 361.  In that same vein, however, employers are allowed to discipline employees for

working overtime hours against the employer's wishes — the employer must pay for overtime, but it need not welcome it.  *See Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008).

## IV.   MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* (internal quotation marks omitted).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).  But "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Jaramillo*, 536 F.3d at 145.

### A. As Against Vecchio

The defendants first move for summary judgment against Vecchio as to her minimum wage claims.  They argue that the plaintiff's own expert, in using Vecchio's documentation and testimony to illustrate her model, found that Vecchio did not suffer any federal minimum wage violations.   Indeed, Plancich concluded:  "Ms. Vecchio does not have Federal minimum wage violations."   In defense, Vecchio notes that her expert's review of the record was simply preliminary and illustrative.  "When Dr. Plancich is

supplied with more data," Vecchio argues, "'she will use everything that we would have and give you a more robust average.'"  Doc. 3817 at 3 (quoting Badala Decl. in Opp. to Mot. for Partial Summ. J. ex. 1 ("Plancich Dep.") 67:12–16).

It is unclear what use additional time could be to her.  Vecchio has been named plaintiff in this case since its inception four years ago, and formal discovery has proceeded for nearly as long.  Vecchio already moved for extensions of time for expert discovery to provide her expert additional data — all of which Judge Fox granted.  After ExamOne filed its motion for partial summary judgment in February, this Court allowed Vecchio over six weeks to formulate her opposition.  Given that Vecchio could not provide her expert with the needed information after all of this, the Court will not deny summary judgment based on speculation of what Plancich could come up with between now and a trial.

Nor has Vecchio identified what data she could provide that would enable her expert to come to a more favorable conclusion.  On this point, Vecchio notes that there is no "substantive timekeeping" on which her expert can rely.  While it is true that ExamOne was required to keep accurate records of Vecchio's work, *see* 28 U.S.C. § 211(c), the failure to do so does not automatically entitle Vecchio to victory.  Rather, she must estimate the hours she worked and the wages she is owed.  *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).  To do so, she may engage an expert to assist in those calculations.  She did, and — to her evident chagrin — that expert found that there were no violations of the federal minimum wage laws.  Based on this expert opinion — proffered for the purposes of this motion by ExamOne — the Court finds that ExamOne has made its initial showing that there is no dispute over whether Vecchio herself suffered minimum wage violations.

Of course, the burden now shifts to Vecchio to create a genuine dispute of material fact.  *See Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010).  In her attempt to do so, Vecchio points only to her own deposition testimony, in

which she asserts that she earned less than the minimum wage because she worked long hours for ExamOne.  She argues that this testimony alone is enough to dispute Plancich's unreserved conclusion that Vecchio suffered no federal minimum wage violations.

But without even an estimate of the amount of money she earned in a given week that could lead to a "just and reasonable inference" conflicting with Plancich's opinion, *Kuebel*, 643 F.3d at 362, this Court cannot find that there is a genuine issue of material fact for a jury to resolve.[5]  Vecchio's conclusion that she *must* have earned less than the minimum wage amounts to bare speculation and alone is not enough to satisfy her burden.  *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." (internal citations omitted)).  Accordingly, the Court GRANTS the defendants' motion for partial summary judgment as to Vecchio's minimum wage claims.

### B.  As Against the 32 Opt-In Plaintiffs

The defendants also move to dismiss the overtime claims of the 32 opt-in plaintiffs identified in *supra* note 1.  The defendants point to the transcripts of each of these plaintiffs' depositions in support.  Twenty-two of these opt-in plaintiffs affirmatively testified that they did not work more than 40 hours in any given week.[6]  Eight testified that they could not recall whether they worked more than 40 hours or otherwise equivocated.[7]  Dickinson indicated that she was neither scheduled for nor recorded more than 40 hours in a week.  And Lisa Dunn indicated that she worked 60 to 80 hours in a week for a number of companies, including ExamOne.

---

[5] The wage data Vecchio provided to Plancich has not been provided to the Court.

[6] Specifically:  Broady, Christion-Amador, Clyde, Contreras, Craig, Davis, Michelle Dunn, Fagan, Fantroy, Gee, Harris, Kresko, Martin, Morrison, Pope, Raso, Robertson, Rodriguez, Schaefer, Truett, Wood and Pichon.

[7] Specifically:  Anderson, Hough, Knowles, Laurel, Parks, Pitzer, Gonzalez, and Thomas.

Vecchio, on behalf of these opt-in plaintiffs, urges the Court to deny summary judgment because the hazy nature of these plaintiffs' recollections is not sufficient to establish that they never worked more than 40 hours in a week.  As an initial matter, this argument does not apply to the 22 plaintiffs who unequivocally stated they did not work more than 40 hours in a week.[8]  For all of the others, the Court would only agree if there were *any* other evidence that tended to suggest these plaintiffs had worked more than 40 hours in *any* week for ExamOne.  *See Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (finding a failure to recall does not create genuine dispute of material fact alone).

But there is no such evidence.  For 30 of these opt-in plaintiffs, Vecchio did not submit a single document in opposition other than the deposition transcript excerpts already provided by the defendants.  And the proof Vecchio did submit on the behalf of the other two opt-in plaintiffs — *i.e.*, one page of Harris' deposition transcript and two pages of Parks' — does not address the time worked by these plaintiffs in excess of 40 hours at all.[9]

Vecchio does suggest that applying her expert's methodology to these opt-in plaintiffs could still reveal violations of the overtime laws.  That may be true.  But, critically, Vecchio, on whom the burden to create a genuine dispute of material fact rests, *did not apply her expert's methodology to these opt-in plaintiffs*.  The two cases she cites

---

[8] Vecchio argues that the Court should deny summary judgment as to even these defendants because "knowledge as to [employees'] wage theft is not an element of an FLSA overtime claim."  Doc. 3187 at 8 (citing *Almanzar v. C & I Assocs.*, 175 F. Supp. 3d 270, 273 (S.D.N.Y. 2016)).  While an accurate statement of the law, this assertion is irrelevant.  Vecchio must still demonstrate via *some* evidence that these opt-in plaintiffs worked over 40 hours at some point in order to defeat summary judgment.  *See, e.g.*, *Almanzar*, 175 F. Supp. 3d at 274.

[9] The disposition of this motion as to Lisa Dunn is a slightly closer question, as her testimony indicates that she worked for more than 40 hours in a given week, albeit for a number of companies.  Vecchio does not, however, provide any proof that suggests that Dunn ever worked for more than 40 hours for ExamOne alone, and therefore summary judgment is appropriate.  Futhermore, the testimony proffered by ExamOne shows that Dunn would find it "hard" to provide any estimate as to how much she worked for any one employer, further counseling in favor of granting summary judgment.  Rooney Decl. in Support of Mot. for Partial Summary J. ex. II at 37:1–10.

in support of having the Court wait for new results from Plancich between now and trial are inapposite.  *First*, in *Lockheed Martin Transportation Security Solutions v. MTA Capital Construction Co.*, the parties "agreed to proceed with summary judgment briefing before damages discovery was completed," and therefore summary judgment was premature when disputes over damages calculations remained.  No. 09 Civ. 4077 (PGG), 2014 WL 12560686, at *33 (S.D.N.Y. Sept. 16, 2014).  No such agreement is in place here, nor have the parties requested as much from this Court or Judge Fox.  Furthermore, the non-moving party actually produced evidence of damages during briefing, unlike Vecchio here.  *Id.*, at *32.  *Second*, in *Sathe v. Bank of New York*, a dispute over the methodology for calculating a real estate unit's profitability precluded summary judgment.  No. 89 Civ. 6810 (LBS), 1991 WL 102614, at *6 n.6 (S.D.N.Y. May 31, 1991).  Here, there is no disagreement regarding how to calculate these plaintiffs' damages, because Vecchio has produced no estimate of those damages *at all* of her own.

In the absence of *any* evidence that tends to create a genuine dispute of material fact as to the overtime claims of the 32 opt-in plaintiffs named in *supra* note 1, the Court GRANTS the defendants' motion for partial summary judgment.

## V.    MOTION FOR DECERTIFICATION

The defendants move for decertification of the collective, arguing that the opt-in plaintiffs are not similarly situated to the named plaintiff, Vecchio.  The Court agrees, grants the defendants' motion, and dismisses the claims of the opt-in plaintiffs without prejudice.

### A.  The "Similarly Situated" Test

Persons "similarly situated" to a named plaintiff may join an FLSA lawsuit.  29 U.S.C. § 216(b).  A feature aimed at fulfilling FLSA's remedial purpose, section 216(b) allows plaintiffs to pool their resources and take "advantage of lower individual costs to vindicate rights by the pooling of resources."  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 515–16 (2d Cir. 2020), *petition for cert. filed*, No. 20-257 (U.S. Aug. 28, 2020).

(quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  Unlike the class action mechanism of Rule 23 of the Federal Rules of Civil Procedure, section 216(b) grants opt-in plaintiffs a right to join in the named plaintiff's claims.  *See id.* at 515.

The Second Circuit has approved a two-step approach in determining whether opt-in plaintiffs are similarly situated to the named plaintiff.  *Scott*, 954 F.3d at 515.  In the preliminary certification phase, a district court examines affidavits and determines whether the named plaintiffs have made a "modest factual showing that they and others together were victims of a common policy or plan that violated the law."  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016).  If the plaintiffs make that showing, then the district court allows for a notice to be sent out to potential opt-in plaintiffs.  *Id.*  In the final decertification phase, the court reexamines the collective after the benefit of discovery and makes a final ruling on whether the collective is in fact similarly situated to the named plaintiffs.  *Id.*  In that second phase, the plaintiff has the burden of showing that the opt-in plaintiffs are similarly situated to her.  *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).  If the plaintiffs fail to meet that burden, which is more stringent than that faced in the preliminary phase, then the opt-in plaintiffs are dismissed without prejudice from the lawsuit.  *Id.*

Until recently, courts in this circuit considered three factors when examining whether opt-in plaintiffs are similarly situated to the named plaintiff:  "the (1) disparate factual and employment settings of the plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment." *Zivali*, 784 F. Supp. 2d at 460 (internal alteration and quotation marks omitted).  Various courts have referred to this analysis as the "*ad hoc* approach."  *E.g.*, *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001); *Gardner v. W. Beef Properties, Inc.*, No. 07 Civ. 2345 (NGG) (JMA), 2013 WL 1629299, at *4 (E.D.N.Y. Mar. 25, 2013).

But shortly before briefing of this motion concluded, a panel of the Second Circuit called this *ad hoc* approach into question with its decision in *Scott*. 954 F.3d at 517. The majority first defined "similarly situated" to mean "that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation." *Id.* at 516. Such a similarity is not "any similarity," but rather a "similarity with respect to an issue of law or fact material to the disposition of their FLSA claim." *Id.* at 516 n.4 (responding to the dissent of Sullivan, J.). Then, it compared the requirements of section 216(b) with the predominance requirement of Rule 23 of the Federal Rules of Civil Procedure, ultimately finding that the two analyses were altogether different. "[A]nalogies to Rule 23," the majority held, "are inconsistent with the language of § 216(b) and [the] question of whether plaintiffs may proceed as a collective under the FLSA is to be analyzed under the separate and independent requirements of § 216(b)." *Id.* at 518. Based on this holding, the majority found that the district court had committed an abuse of discretion by applying a higher level of scrutiny to a large collective through analogies to the predominance requirement of Rule 23, as opposed to solely determining whether the plaintiffs were similarly situated. *Id.* at 520–21.

The effect of *Scott* on the *ad hoc* approach is unclear. In its opinion, the majority "question[ed] whether the *ad hoc* approach is consistent with the notion that party plaintiffs are similarly situated . . . to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Scott*, 954 F.3d at 517. It further described the test as "abstract" and cautioned that its use could "import, through a back door, requirements with no application to the FLSA," as it held the district court did in that case. *Id.* Nevertheless, the majority did not explicitly forbid the use of the *ad hoc* approach, instead holding only that "it is error for courts to equate the requirements of

§ 216(b) with those of Rule 23 in assessing whether named plaintiffs are 'similarly situated' to opt-in plaintiffs under the FLSA." *Id.* at 520.[10]

The Court need not determine for the resolution of this motion whether the *ad hoc* test remains a viable tool in this circuit.  It is clear from the *Scott* majority's holding that a prerequisite for certification is the existence of a material similarity.  *See id.* at 516.  The *ad hoc* test contains the same prerequisite.  *See id.* at 524 (Sullivan, J. dissenting) (arguing the need for courts to grapple with both "*similarities* and dissimilarities" through use of the *ad hoc* test (emphasis added)).

**B.  Lack of Similarity**

Vecchio, however, has not proven any such material similarity between herself and the opt-in plaintiffs.  In her briefing, she advances only two potential similarities:  (1) that the members of the collective were all subjected to a policy of requiring off-the-clock work; and (2) that the collective had similar job responsibilities.  Neither is truly a material issue that applies to the entirety of the collective.[11]

*1.  The Policy of Off-the-Clock Work*

Vecchio's primary allegation is that she and the other members of the collective were required to work many hours off-the-clock.  ExamOne allegedly forced them to do so through a combination of official policies to record only time worked away from home and individual communications from management to not record time spent traveling or performing pre-and post-examination work.  If those hours were counted, she argues, she and her fellow mobile examiners would be entitled to minimum wage, overtime, or both.

---

[10] Indeed, one of the cases on which the majority relied allowed the use of an *ad hoc* approach so long as it was "modified so as to account for [its] flaws."  *Scott*, 954 F.3d at 523 (Sullivan, J., dissenting) (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)).

[11] Furthermore, Vecchio has made no request that the Court alter the collective's definition or split it into sub-groups.  *Cf., e.g.*, *Thind v. Healthfirst Management Servcs. LLC*, No. 14 Civ. 9439, 2016 WL 718762 (S.D.N.Y. Dec. 9, 2016) (simultaneously examining a motion to decertify and a motion to amend the complaint to substitute new collective definitions).

Although Vecchio never explicitly describes why having a policy of off-the-clock work would be material to the FLSA analysis,[12] such a policy could be material in two ways. *First*, it could show that ExamOne's record-keeping was "inaccurate or inadequate," allowing the members of the collective to prove their claims through "just and reasonable inference." *Kuebel v. Black & Decker*, 643 F.3d 352, 362 (2d Cir. 2011). *Second*, it could tend to show that ExamOne had actual or constructive notice of hours worked off-clock, rebutting a potential affirmative defense. *See id.* at 361. But even though these issues may be material, they are not common across the collective.

As an initial matter, neither of these analyses will apply to those who worked as independent contractors. ExamOne kept no time-records regarding the work completed by these plaintiffs because it determined that they were not protected by the FLSA and related laws. The policies that Vecchio claims are unlawful — requiring mobile examiners to record only portions of their time — only applied to those examiners classified as employees. Accordingly, this issue is not shared across the collective.[13]

Even if the independent contractors were put to the side, however, the alleged practice would not show a material similarity supporting continued certification. Vecchio has failed to show that it was in fact a *collective-wide* policy to record only the time spent in examinations, with the evidence showing that communication, enforcement, and adherence to the policy of recording time varied across the collective. For example, some managers stressed a policy of recording all time to some examiners, *see, e.g.*, Rooney

---

[12] Vecchio does spend much of her briefing claiming that examiners were not paid for off-the-clock time. *See, e.g.*, Doc. 3190 at 7. But this assertion is simply unsupported by the record. ExamOne may lawfully compensate its examiners at a "piece-rate," that is, for every examination conducted, rather than an hourly wage. *See* 28 U.S.C. § 207(g). Only if the effective wage — as calculated across all recorded and unrecorded time — falls below the minimum wage or if overtime is not paid does a violation arise. Indeed, the record is uncontested that if ExamOne's Teletime system determined an employee was paid below minimum wage or owed overtime, then ExamOne compensated the employee accordingly.

[13] For much the same reason, Vecchio cannot argue that the collective shares a similarity because independent contractors were misclassified. Employees in the collective do not share that issue, and so any classification decision would have no bearing on their cases.

Decl. exs. 8, 9; Harris Dep. 110:18–111:14, while others directed examiners to record only time spent on examinations, *see, e.g.*, Truett Dep. 57:17–22. Some examiners recorded all of their time, *e.g.*, Skelton Decl. ¶ 4, some recorded some time, *e.g.*, Harris Dep. 99:14–101:7, and others recorded no time at all, *e.g.*, Seemer Dep. 27:1–28:15.

Though there may be a dispute about what, in fact, ExamOne's policy was regarding tracking time spent in travel, pre-examination, and post-examination given discrepancies in policy documents, *compare* Rooney Decl. ex. 4 at QUEST 1027 (requiring all time to be recorded) *with* Badala Decl. ex. 15 at QUEST 3 (requiring only time away from home to be recorded), the proof before the Court suggests that there is no single issue common to the entire collective. For some of the employee-plaintiffs, time records may be complete and accurate, while for others they will be non-existent; such a variation would prevent a fact-finder from determining that *all* plaintiffs are entitled to proving their hours worked with a just and reasonable inference. Similarly, the varying testimony across the deposed opt-in plaintiffs illustrates that no fact-finder could make a blanket finding that ExamOne had actual or constructive knowledge of all unrecorded hours worked by the members of the collective.

This finding is similar to those made in both *Thind v. Healthfirst Management Services LLC*, No. 14 Civ. 9439 (LGS), 2016 WL 718762 (S.D.N.Y. Dec. 9, 2016) and *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011). In *Thind*, Judge Schofield found that the collective before her did not share a similarity in their work circumstances because some had been told to work off-the-clock and others had not. 2016 WL 718762, at *3. And in *Zivali*, Judge Rakoff found that the knowledge of individual managers varied, precluding a collective-wide finding of actual or constructive knowledge of plaintiffs' work. 784 F. Supp. 2d at 468. This Court likewise declines to

find that there exists a collective-wide policy of requiring off-clock work that would be material to an analysis under the FLSA.[14]

### 2. The Similarity in Job Responsibilities

Vecchio claims that the job responsibilities of the collective members are sufficiently similar such that the methodology of her expert, Plancich, could be used to estimate hours worked across the collective. If this were true, then the plaintiffs would be similarly situated in a manner that counsels proceeding as a collective.

But they are not. Plancich made her estimates of time worked outside of examinations using the depositions of only 12 opt-in plaintiffs selected by Vecchio. While it is true, at least in actions brought by the Secretary of Labor, that "a 'representative sample' of employees can provide a foundation for assumptions about the overall employee pool," *Harold Levinson Assocs., Inc. v. Chao*, 37 F. App'x 19, 21 (2d Cir. 2002) (citing *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66–67 (2d Cir. 1997)), nowhere in her report does Plancich explain whether this 0.4% of the collective can be fairly considered representative of the whole. *Cf. Reich*, 121 F.3d at 67–68 (finding a sample of 2.5% sufficiently representative); *id.* (collecting cases that found samples of 22.4, 55.9, 10.6, 61.5, and 2.7 percent sufficiently representative).

Of course, "[i]t is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality and that, depending on the nature of the facts to be proved, a very small sample of representational evidence can suffice." *Reich*, 121 F.3d at 67 (internal citations omitted). But Vecchio has not proven that the quality of her sample is any better than its quantity. To begin, Plancich does not explain in her report why only 12 depositions were used despite 59 depositions of employees being taken in this matter or why those particular 12 deponents were chosen. Although the Court does not go so far

---

[14] Vecchio argues that this Court faces "precisely the opposite situation, where examiner after examiner has testified that they were directed to work off-the-clock." Doc. 3190 at 8. But Vecchio overstates the record. As noted, the record shows that any policy of directing off-clock work was inconsistently applied across the collective, and accordingly cannot form the basis for a collective-wide finding.

to find that this decision is "biased" as ExamOne's expert opines, Krock Rep ¶ 47, it does find that these omissions reduce the weight of this evidence.  Furthermore, the 12 deponents Vecchio provided to Plancich show wide variation in the amount of time they spent on various tasks, further showing that this hand-picked dozen — and therefore this methodology — can not be used to show that all nearly 3000 opt-in plaintiffs are similarly situated for purposes of certification.

Instead, the Court will look to the weight of the evidence presented by the dozens of depositions produced by the defendants in their decertification motion.  As described in *supra* Part I.C, these depositions show that the examiners varied widely in how long it took to perform examination procedures, pre-appointment work, post-appointment work, and to travel.  It would be impossible for the Court or a jury to decide in one fell swoop the proper hours calculation for the entire collective, even given the relatively low requirement that it make such a finding using a "just and reasonable inference." Accordingly, the Court finds that the collective is not similarly situated in this respect.

* * *

As Vecchio has not proffered *any* true similarities between herself and the collective, ExamOne's motion for decertification is granted.  The Court, however, stresses two final points in conclusion.  *First*, finding that the collective must be decertified does not imply that the members of the collective do not have valid claims under the FLSA. The collective members' claims are dismissed without prejudice, and they may choose to refile their claims separately or as their own collectives that are similarly situated.  And, *second*, the Court does not make this finding because it determines that the differences among the members of the collective outweigh the similarities.  Rather, it makes this determination because Vecchio's proffered similarities between herself and the collective are merely superficial; none are in *any* respect material to the disposition of their claims. *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020).  For these reasons, the claims of all opt-in plaintiffs are DISMISSED without prejudice.

## VI.    CONCLUSION

For the forgoing reasons, the defendants' motions for summary judgment and decertification are GRANTED.  The Court makes the following orders:

- Vecchio's minimum wage claims are DISMISSED with prejudice;
- The overtime claims of the 32 opt-in plaintiffs named in *supra* note 1 are DISMISSED with prejudice; and
- The claims of all remaining opt-in plaintiffs are DISMISSED without prejudice.

The parties are directed to appear for a status teleconference on October 9, 2020, at 10:30 a.m.  They are further are directed to dial (877) 411-9748 and enter access code 302 9857# at that time.  The Clerk of Court is respectfully directed to terminate all plaintiffs in this case except for Vecchio and terminate the motions, Docs. 3174, 3179, and 3184.[15]

It is SO ORDERED.

Dated:    September 18, 2020
             New York, New York

_____
             EDGARDO RAMOS, U.S.D.J.

---

[15] The application for oral argument is denied as moot.